STATE OF NORTH CAROLINA, ON RELATION OF THE NORTH CAROLINA MILK COMMISSION v. M. O. GALLOWAY.

(Filed 18 March, 1959.)

**1. Appeal and Error § 49—**

Where the findings of fact of the lower court are supported by substantial competent evidence and stipulations of the parties, such findings are binding and conclusive on appeal.

**2. Agriculture § 15—**

The N. C. Milk Commission is empowered to fix the transportation rates for hauling milk of producers to processing plants. G.S. 106-266.8 (c), (g), (j).

**3. Agriculture § 14:	Constitutional Law § 7—**

The statute conferring upon the N. C. Milk Commission power to fix prices in respect to milk and its products in intrastate business, prescribes the standards for the guidance of the Commission, leaving to the Commission only its proper administrative function, and therefore the Act is a constitutional delegation of power, G.S. 106-266.8 (j), with further protection against abuse of such power by provision for appeal and a hearing *de novo* in the Superior Court. G.S. 106-266.17.

**4. Agriculture § 14:	Constitutional Law §§ 20, 24—**

An order of the N. C. Milk Commission prescribing a uniform hauling charge equal upon all producers delivering milk to a certain distributor, regardless of the distance or route, is not arbitrary nor discriminatory and is relevant to the legislative purpose of the Milk Commission Act, and such regulation, replacing a system of charges varying in accordance with the routes of the milk trucks, does not deny a producer the equal protection of the laws or deprive him of property without due process of law, even though he is subject under the regulation to a higher charge than he was under the old system. Constitution of North Carolina, Article I, Section 7 and Article I, Section 17; 14th Amendment to the Constitution of the U. S.

**5. Constitutional Law § 6—**

Outside the power granted to the Federal Government, the power of the Legislature of North Carolina to enact statutes is without limit, except as restrained by the Constitution of North Carolina.

**6. Constitutional Law § 10—**

The courts will not pronounce an act of the General Assembly unconstitutional unless it is plainly so.

RODMAN, J., not sitting.

APPEAL by M. O. Galloway from *Patton, J.,* November-December Civil Term 1958 of BUNCOMBE.

This proceeding arises from an order entered on 8 April 1958 by the North Carolina Milk Commission instituting a uniform hauling charge per cwt. for each producer delivering milk to Biltmore Dairies, Asheville Plant, regardless of his volume of milk or distance from the plant, to become effective on 1 April 1958.

On 18 April 1958 M. O. Galloway, the appellant, a milk producer and a member of Biltmore Producers Association residing in Buncombe County, pursuant to G.S. 106-266.17, appealed from said order to the Superior Court of Buncombe County. On the same day Judge Zeb V. Nettles, Resident Judge of the Buncombe County Judicial District, acting under the authority vested in him by the same section of the General Statutes, entered a special order staying the enforcement of the order of the North Carolina Milk Commission pending the final adjudication of Galloway's appeal.

Pursuant to the same section of the General Statutes, the proceeding was placed on the civil issue docket of the Superior Court of Buncombe County, and heard *de novo* under the same rules as are prescribed for the trial of civil actions.

When the proceeding came on to be heard before Judge Patton, all the parties stipulated and agreed to a waiver of trial by jury, and that the Judge should find the facts, make conclusions of law, and render judgment. G.S. 1-184 and 1-185.

The substance of the findings of fact are these:

Biltmore Dairy Farms (also called in the Record, Biltmore Dairies, and hereafter to be called Biltmore) is a duly licensed distributor of milk and its products in Area 8, with its processing plant for this area situate near Asheville, Buncombe County. Area 8 comprises Buncombe, Haywood, Cherokee and a number of other counties in Western North Carolina. M. O. Galloway, a resident of Buncombe County, is a milk producer, who sells all of his milk to Biltmore.

A year prior to April 1957 Biltmore notified its producers to install bulk milk tanks on their farms, so that beginning on 1 April 1957 it might load their milk in bulk tank trucks by pumping the milk from the tanks into the trucks. This system has a number of advantages over the old system of picking up the milk in cans, and

has been instituted in recent years by many milk distributors in North Carolina and other states. On 1 April 1957 the new system went into effect. To gather the milk, Biltmore had 8 trucks: 7 of which follow regular routes, and one is a relief truck. The routes were worked out by Biltmore's field man, Mr. Fox.

Driver Farnsworth covers routes 1 and 4, and picks up milk from producers in Buncombe and Henderson Counties, particularly in the Fletcher and South Buncombe areas. Driver Moore covers routes 2 and 16, and the producers on his routes are also in Buncombe and Henderson Counties. Driver Prince has routes 3, 5, 8 and 15, and the producers on his routes are in Rutherford, McDowell, Haywood, Burke and Buncombe Counties. Driver Morgan covers routes 6 and 17 with producers in Madison, Buncombe, Transylvania and Henderson Counties. Driver Edwards covers routes 7 and 10 with producers in Madison, Yancey and Buncombe Counties. Driver Horton (formerly Driver Corn) covers route 11 with producers in Polk, Rutherford and Spartanburg (South Carolina) Counties. Driver Harrell has routes 9 and 14 with producers in Yancey and Mitchell Counties.

The North Carolina Milk Commission (hereafter called Milk Commission) has established a minimum price of $6.55 cwt. to be paid by the distributor to the producer for Class I milk f. o. b. the distributor's plant, with lesser prices for lower classes of milk. The cost of transporting the milk from the farm to the distributor's plant to be paid by the producer. The transportation of milk from the farm of the producer to the distributor's plant is handled in various ways in North Carolina, e. g. by contract haulers, but in all cases the producer pays for the hauling.

"Since Biltmore began hauling all its producers' milk in April, 1957, it has charged its producers for hauling on the following basis: The cost of operating each of the seven regular trucks is computed and the cost is then allocated among the producers served by that truck so that each producer on the routes served by that particular truck pays the same weight per hundred pounds; however, the rate charged the individual producer varies considerably depending upon the route to which he is assigned. Biltmore's figures reflect that during the months from April, 1957, to January, 1958, (Exhibit 'A' in the Stipulation) the cost of operating the Farnsworth truck on routes 1 and 4 was $11,683.65; 6,912,400 pounds of milk were transported, and thus the rate per 100 pounds for producers on routes 1 and 4 was 16.9 cents. The next lowest rate was charged the producers served by the Moore truck, routes 2 and 16, to wit, 25.8 cents. The highest rate was charged

the producers on the Corn truck, 30.2 cents. The average rate charged all producers was 26 cents for this period. The recapitulation of all charges from April, 1957, through October, 1958, (Exhibit 'B-1') reflects a charge of 17 cents on the Farnsworth route, 31 cents on the Corn route and Prince route, with rates on the other routes being 27 cents or 29 cents and the average rate being 26 cents.

"Under the system of hauling charges made by Biltmore since April, 1957, a number of inequities have resulted. The producers on the Farnsworth route have been charged 17 cents per cwt. compared to the average rate of 26 cents (Exhibit 'B'); whereas all other producers have been charged more than the average, ranging from 27 cents to 31 cents. The same two counties were served by the Moore routes and the Farnsworth routes, to wit, Buncombe and Henderson; yet the Moore route producers were charged 27 cents, the Farnsworth producers 17 cents. The Buncombe County producers who happened to be assigned to the Prince routes have paid a higher rate (31 cents) than the Yancey and Mitchell Counties producers on the Harrell routes (29 cents) and likewise higher than the Madison, Transylvania and Henderson producers on the Morgan route (27 cents). The Buncombe County producers on the Moore, Prince, Morgan and Edwards routes have all been forced to pay at least 10 cents more per cwt. than the Henderson County producers on the Farnsworth routes. Many of the routes touch each other at some point. Route #11 going to South Carolina goes right past certain producers who are on the Farnsworth low-price routes; likewise, the Morgan route to Transylvania County goes past the farms of certain producers on the Farnsworth routes. The luck of a certain producer in being assigned to one route as compared to another route may mean a difference of 10 cents to 14 cents per cwt. in his hauling charges, and the evidence showed that Biltmore has on several occasions changed producers from one route to another. For example, Max Carland was switched from another route to the Farnsworth route, though the location of his farm was not changed, and this resulted in a saving of 10 cents per cwt. on his hauling charges.

"Exhibit 'D' reflects the losses that certain producers on the Farnsworth route would suffer if Biltmore charged all its producers the same price for hauling. The producers on the Farnsworth route would suffer a loss as indicated; however, all the producers on the other six routes would realize a gain. The names of two producers were omitted from Exhibit 'D', to wit, Biltmore Dairy Farms' own herd, and the herd of Biltmore's General Manager E. D. Mitchell. Both these herds were assigned to the Farnsworth route and would lose substantially

(9 cents per cwt.) if a change were made from the present system of hauling charges to a system of charging each producer an equal rate per cwt. The production of the Biltmore herd is about four times that of the second largest producer on the Farnsworth route, to wit, Fairfield Farms, and the production of the E. D. Mitchell herd ranks third ahead of the production of Frank Burgin. It appears from the figures on Exhibit 'D' that the defendant M. O. Galloway would have been charged an additional $73.47 in 1957, and an additional $235.93 for the period from January through September, 1958, had Biltmore been charging all producers the same price for hauling."

Biltmore Producers Association, dissatisfied with Biltmore's hauling charges, petitioned the Milk Commission to hold a hearing in respect to these charges. After the Milk Commission had mailed a notice of such hearing to all milk producers in Area 8, it held a public hearing on 18 March 1958 in the Buncombe County Courthouse. M. O. Galloway received a notice of the hearing, but did not attend. At this hearing substantially all who spoke favored a uniform hauling charge for all producers, regardless of route to which the producer is assigned, distance from the plant or volume of milk. "Following the hearing the Milk Commission ordered Biltmore to cease its existing system of hauling charges and to institute a system of uniform hauling charges per cwt. to all producers for all milk delivered to its Asheville plant on and after 1 April 1958." Within due time M. O. Galloway appealed to the superior court. No appeal was taken by any other producer or by Biltmore.

The judge's conclusions of law are stated separately and in substance are as follows:

One. The Milk Commission Act, and in particular subsections (b), (c), (d), (g) and (j) of G.S. 106-266.8, give ample authority to the Milk Commission (and to this Court upon appeal) to enter an order regulating the charges made by Biltmore for hauling its producers' milk from the farm to the plant. Without such authority, the delegation of the power to the Milk Commission to fix prices to be paid producers by distributors would be meaningless, inasmuch as a distributor by unreasonable hauling charges could prevent the producer from receiving reasonable compensation for his milk.

Two. The delegation of this power to the Milk Commission does not contravene either the State or Federal Constitution.

Three. The present system of hauling charges used by Biltmore is not fair, equitable or reasonable for the reasons set out in the Court's findings of fact.

Four. An order directing Biltmore Dairy Farms to cease its exist-

ing system of hauling charges and to institute a new system whereby the cost of hauling the milk from farm to plant is divided equally among all producers so that each producer is charged the same rate per cwt. of milk regardless of route to which he is assigned, distance from the plant, or volume of milk, would in the judgment of this Court constitute a fair and reasonable regulation of the transportation by Biltmore Dairy Farms of the milk of its producers from the farm to the plant.

Whereupon the judge entered judgment decreeing and adjudging "that Biltmore Dairy Farms cease forthwith its existing system of hauling charges and institute a new system whereby the total cost of hauling all its producers' milk from the farm to its Asheville plant is divided by the total number of pounds of milk hauled to establish a rate per cwt. of milk which shall be applied to all its producers so that each producer is charged the same rate per cwt. of milk regardless of the route to which he is assigned, his distance from the plant, or the volume of his milk, the new system of hauling charges to apply to all milk picked up by Biltmore on or after December 1, 1958."

From the judgment M. O. Galloway appealed.

*Harris, Poe & Cheshire for plaintiff, appellee.*
*Lee & Lee for defendant, appellant.*

PARKER, J. The findings of fact by the Trial Judge are amply supported by substantial competent evidence and stipulations entered into by the parties. Therefore, such findings of fact are as binding as the verdict of a jury, and are conclusive on appeal. *Goldsboro v. R. R.*, 246 N.C. 101, 97 S.E. 2d 486; *St. George v. Hanson*, 239 N. C. 259, 78 S.E. 2d 885; *Trust Co. v. Finance Co.*, 238 N.C. 478, 78 S.E. 2d 327. The appellant in his brief makes no argument to the contrary.

The appellant in his brief states that all his assignments of error deal directly with (1) the power of the Court under the State Milk Commission Act to fix transportation rates for hauling milk of producers to the processing plant, and (2) whether the judgment violates appellant's rights under Article I, Section 7, and Article I, Section 17 of the North Carolina Constitution, and Section 1 of the 14th Amendment to the United States Constitution. Appellant does not contend that the Act as a whole is unconstitutional.

The question for our determination is, whether the language of the Act creating the North Carolina Milk Commission and conferring upon it the power to supervise, regulate and control the milk industry

empowered the Milk Commission to fix the transportation rates for hauling milk of the producers to the processing plant, and if so, does the judgment entered violate appellant's rights as set forth in the parts of the State and Federal Constitutions specified by him in his brief. That Act was first enacted in 1953. Chapter 1338, 1953 Session Laws of North Carolina. With subsequent amendments it has been codified as Article 28B, Chapter 106, Agriculture, G.S. of N.C., Sections 106-266.6 to 106-266.21, inclusive.

The considerations which impelled the General Assembly to adopt the Act are found in its preamble on page 1323, Acts of 1953. The preamble states: "The facts herein set forth in this preamble are declared to be matters of legislative finding and determination." Among the facts set forth in the preamble to the Act are these: "Milk is a primary and necessary food for the children and adult population of the State. . . . It is vital to the public health and welfare of the people of the State that the production, transportation, processing, storage, distribution and sale of milk shall be carried on in a fair, just and equitable manner with purity of content, and the milk industry is a business or industry affecting the public health and interest; that it is necessary for the safety, health and welfare of the people of the State that this industry be subjected to some governmental restrictions, regulations and methods of inspection; that it is necessary to suppress unfair, unjust and destructive trade practices which are now being carried on in the production, marketing and distribution of milk and which tends to create a hazardous and dangerous condition with reference to the health and welfare of the people of the State." Other facts stated in the preamble, as well as the Act itself, make it plain that the General Assembly was also concerned with suppressing unfair and destructive trade practices, and with stabilizing the milk industry, so as to enable the producers to secure a fair price for their milk. These recitals in the preamble set the framework for the legislation.

There is no inherent power in the State Milk Commission to fix transportation rates for hauling milk of producers to a processing plant. If it has such power, it must be found in the Act.

G.S. 106-266.8 declares the North Carolina Milk Commission to be an instrumentality of the State of North Carolina, and vested with power:

"(b) To investigate all matters pertaining to the production, processing, storage, distribution, and sale of milk for consumption in the State of North Carolina.

"(c) To supervise and regulate the transportation, processing, stor-

age, distribution, delivery and sale of milk for consumption. . . .

"(d) To act as mediator or arbiter in any controversial issue that may arise among or between milk producers and distributors as between themselves, or that may arise between them as groups.

"(g) To hold hearings, make and adopt rules and regulations and/or orders necessary to carry out the purposes of this article. . . .

"(j) The Commission after public hearing and investigation, may fix prices to be paid producers and/or associations of producers by distributors in any market or markets, and may also fix different prices for different grades or classes of milk. In determining the reasonableness of prices to be paid or charged in any market or markets for any grade, quantity, or class of milk the Commission shall be guided by the cost of production and distribution, including compliance with all sanitary regulations in force in such market or markets, necessary operating, processing, storage and delivery charges, the prices of other foods and other commodities, and the welfare of the general public.

"(m) The Commission may define after a public hearing what shall constitute a natural market area and define and fix limits of the milk shed or territorial area within which milk shall be produced to supply any such market area. . . ."

The Act in G.S. 106-266.6 defines "Market" as meaning "any city, town, or village of the State, or any two or more cities and/or towns and/or villages and surrounding territory designated by the Commission as a natural marketing area."

Our Act follows closely the Virginia Act on the same subject. Much of the language is verbatim in the two statutes. G.S. 106-266.8 (b), (c), (d) and (g), and Code of Virginia, Section 3-352 (b), (c), (d) and (g) are nearly verbatim. "Market" as defined in G.S. 106-266.6 is identical with "Market" as defined in Code of Virginia, Section 3-346.

G.S. 106-266.8(j), as above set forth, grants the State Milk Commission the power to fix prices to be paid producers of milk by distributors. The Virginia Act in Section 3-359 gives identical power to its Milk Commission in the same words, with this proviso that the Virginia Milk Commission has the additional power to "fix the minimum and maximum wholesale and retail prices to be charged for milk in any market."

In *Southside Coop. Milk Pro. Ass'n. v. State Milk Commission,* 198 Va. 108, 92 S.E. 2d 351 (April 1956), the Court said: "The Commission, under Code, Section 3-352(c) has supervisory authority over all the facets of the industry, including transportation and delivery

. . . In view of the very broad powers conferred upon the Commission to make, adopt, and enforce all rules, regulations, or orders necessary to carry out the provisions of the Act, Section 3-352(g), we do not think that the designation of places for delivery of milk to the distributor, and the regulation of hauling allowances to distributors for transporting such milk to their processing plants are beyond the authority of the Commission. We find nothing in the evidence to justify the contention that the Commission has been unreasonable, arbitrary or discriminatory in designating certain producers to make delivery at Norfolk and others at Amelia, nor do we find that the effect of setting different prices based on the cost of hauling is in violation of the Act under consideration. We cannot say that the Commission, in an overall view of all the facts and circumstances involved, including a consideration of the interests of the industry and the public, exceeded its authority or abused its discretion in entering the orders complained of."

The validity of the Virginia Statute was sustained by the Supreme Court of Appeals of Virginia. *Reynolds v. Milk Commission of Virginia,* 163 Va. 957, 179 S.E. 507. A large part of the opinion was devoted to the constitutionality of such regulation of the milk industry, rather than to a consideration of the validity of specific provisions of the Act. It would seem from a study of the opinion that the Court held that legislative power had not been invalidly delegated to the Commission. The Federal District Court, with a Circuit Judge and two District Judges sitting and with Circuit Judge Soper writing the opinion, also sustained the Virginia Act. *Highland Farms Dairy v. Agnew,* 16 F. Supp. 575 (E. D. Va. 1936), which decision was affirmed by the United States Supreme Court, *Highland Farms Dairy v. Agnew,* 300 U. S. 608, 81 L. Ed. 835. In 1950 the validity of the Virginia Act was again sustained by the Supreme Court of Appeals of Virginia, this time against attacks on specific grounds, one of which was that the Act unlawfully delegated to private persons the power of legislation. *Board of Supervisors, Etc. v. State Milk Commission,* 191 Va. 1, 60 S.E. 2d 35.

G.S. 106-266.8(c) gives to the State Milk Commission the specific power to supervise and regulate almost the entire milk industry, including the transportation of milk for consumption. G.S. 106-266.8(j) gives to the Milk Commission express power, after public hearing and investigation, to fix prices to be paid producers of milk by distributors, and establishes sufficient standards for its guidance by setting forth in the statute a reasonably clear formula to govern the Milk Commission in determining the reasonableness of the prices to be

MILK COMMISSION v. GALLOWAY.

paid to the producers of milk by the distributors. This leaves to the Milk Commission its proper administrative function. There is a sedulous protection against abuse of power by the Milk Commission provided in G.S. 106-266.17, which requires that when an appeal is taken from an order of the Milk Commission, the proceeding shall be heard *de novo* in the Superior Court. If the Milk Commission should not have the power to regulate and to fix transportation rates for the distributor hauling milk of the producers to the processing plant, as the Trial Court aptly said in its judgment, "the delegation of the power to the Milk Commission to fix prices to be paid producers by distributors would be meaningless, inasmuch as a distributor by unreasonable hauling charges could prevent the producer (sic) from receiving reasonable compensation for his milk." In view of the very broad powers conferred upon the Milk Commission by G.S. 106-266(g) to hold hearings, make and adopt rules and regulations and orders necessary to carry out the purposes of the Act, we hold that the Milk Commission, and the Superior Court on appeal, had the power, fairly implied from the language of the Act and essential to putting into effect its declared purposes and objects, to regulate and to fix transportation rates for distributors in North Carolina hauling milk of their producers in North Carolina to their processing plant in North Carolina — all intrastate business—, and that sufficient standards for their guidance in regulating and fixing such hauling prices is to be fairly implied from G.S. 106-266.8(j).

It appears from the findings of fact that some of the milk hauled on Route 11 comes from Spartanburg County, South Carolina. The question whether the transportation-fixing regulation can be made applicable to this milk brought from South Carolina without violating the commerce clause of the Federal Constitution is not presented for decision, and that question is expressly reserved for decision, if and when it should arise. *Baldwin v. Seelig*, 294 U.S. 511, 79 L. Ed. 1032, 101 A.L.R. 55.

A State Legislature, in the exercise of the police power, may delegate to a Milk Control Commission or Board the power to fix prices in respect to milk and its products on intrastate business, so long as the Legislature sets the standard in the Act, leaving to the Commission or Board its proper administrative function. 22 Am. Jur., Food, p. 865; Annotations: 101 A.L.R. 65; 110 A.L.R. 646; 119 A.L.R. 245, where the cases are assembled. The authority of a State Legislature, in the exercise of the police power, to regulate the price of milk through the agency of an administrative board was upheld in *Nebbia v. New York*, 291 U.S. 502, 78 L. Ed. 940, 89 A.L.R. 1469. The same

principle of law applies to the regulation of hauling rates here, and the granting of such power to the Milk Commission here is not an unlawful delegation of legislative power.

The new system of rates for hauling milk by the distributor in the instant case replaced a system of hauling charges manifestly unfair. The transportation rates for hauling milk decreed here are neither arbitrary, nor discriminatory, nor irrelevant to the legislative purpose of the Act. When such is the case, regulations of the prices are generally regarded as within the constitutional powers of the States, and as not denying the equal protection of the laws. 16A C.J.S., Constitutional Law, p. 370; 22 Am. Jur., Food, p. 865; *Borden's Farm Products Co. v. Ten Eyck*, 297 U.S. 251, 80 L. Ed. 669; *Hegeman Farms Corp. v. Baldwin*, 293 U. S. 163, 79 L. Ed. 259; *Nebbia v. New York, supra;* Annotations: 101 A.L.R. 72; 110 A.L.R. 654; 119 A.L.R. 249; 11 Am. Jur., Constitutional Law, Section 282; *Knudsen Creamery Co. of California v. Brock*, 37 Cal. 2d 485, 234 P. 2d 26 — rehearing denied 26 July 1951.

In *Hood v. Du Mond*, 336 U. S. 525, 93 L. Ed. 865, it is said: "Production and distribution of milk are so intimately related to public health and welfare that the need for regulation to protect those interests has long been recognized and is, from a constitutional standpoint, hardly controversial. Also, the economy of the industry is so eccentric that economic controls have been found at once necessary and difficult. These have evolved detailed, intricate and comprehensive regulations, including price-fixing. They have been much litigated but were generally sustained by this Court as within the powers of the State over its internal commerce as against the claim that they violated the Fourteenth Amendment."

So far as this appellant and other milk producers in North Carolina affected by the judgment entered here are concerned, the parts of the Act challenged on appeal are constitutional, and the judgment deprives him and them of no rights given them by Article I, Section 17, of the State Constitution and by Section 1 of the 14th Amendment to the Federal Constitution.

Article I, Section 7, of the North Carolina Constitution and Article I, Section 4, of the Virginia Constitution are substantially identical. The Virginia Supreme Court of Appeals has sustained their Act in *Reynolds v. Milk Commission of Virginia, supra,* and in *Board of Supervisors, Etc. v. State Milk Commission, supra.* The same Virginia Act has been sustained in *Highland Farms Dairy v. Agnew, supra,* in the Federal District Court of Virginia and in the U. S. Supreme

Court. Our Act does not violate Article I, Section 7, of the State Constitution.

Outside the power granted to the Federal Government, the power of the Legislature of North Carolina to enact statutes is without limit, except as restrained by the Constitution of North Carolina. Courts ought not to pronounce any act of the Legislature unconstitutional unless it is plainly so.

To sustain the contentions of the appellant would strike at the heart and purpose of the legislation, and would seriously hamper the North Carolina Milk Commission, and the Superior Court on appeal, in exercising the powers and duties conferred upon them by the Act.

The judgment appealed from is affirmed, with this reservation that the question as to whether the transportation-fixing regulations here can be made applicable to the milk hauled from South Carolina without violating the commerce clause of the Federal Constitution is not presented on this appeal for decision, and is not decided.

Affirmed.

RODMAN, J., not sitting.