STATE OF NORTH CAROLINA ON RELATION OF THE NORTH CAROLINA MILK COMMISSION v. NATIONAL FOOD STORES, INCORPORATED, A NORTH CAROLINA CORPORATION.

(Filed 24 May, 1967.)

**1. Agriculture § 14; Constitutional Law § 23—**

The State Milk Commission has statutory authority to fix a uniform rate for the transportation of milk from farm to the processing plant and to maintain a fair price to the producer, and such statutory provisions have reasonable relationship to the assurance of an adequate supply of wholesome milk, and are constitutional.

**2. Agriculture § 15—**

The State Milk Commission has not fixed a price to be charged by retail grocery stores in the sale of milk to consumers, and therefore the authority of the Commission to do so is not involved in an action to restrain a grocery chain from selling milk below cost. G.S. 106-266.8(2)(3).

**3. Agriculture § 17—**

The enumeration by G.S. 106-266.21 of the facts which may be shown by a retailer selling milk below cost in order to rebut the presumption that such sale was made for the purpose of injuring, harassing or destroying competition, *held* not exclusive, and the *prima facie* case arising from sale below cost may be rebutted by proof of any circumstances which would tend to disprove an intent on the part of the retailer to injure, harass or destroy competition. To construe the statute otherwise would raise grave question as to its constitutionality.

**4. Statutes § 4—**

A statute will not be construed so as to raise a serious question as to its constitutionality when a reasonable construction will avoid such question.

**5. Constitutional Law § 6; Evidence § 4—**

The General Assembly may provide that the proof of one fact shall be deemed *prima facie* evidence of a second fact, provided there is such re-

lation between the two facts in human experience that proof of the first may reasonably be deemed some evidence of the existence of the second.

**6. Agriculture § 14—**

G.S. 106-266.1 *et seq.*, including amendments, must be construed in the light of its purpose to protect the public interest in a sufficient, regularly flowing supply of wholesome milk and, to this end, to provide a fair price to the milk producer, and the act is not for the purpose of regulating competition among retail grocery stores *per se.*

**7. Statutes § 5—**

While a statute must be construed to carry out the legislative intent, that intent must be found from the language of the act, its legislative history, and circumstances surrounding its adoption which will throw light upon the evil sought to be remedied, and such intent may not be established by testimony of members of the Legislature which adopted the statute nor by the affidavits of witnesses as to their opinion of the purpose of the act.

**8. Agriculture § 14—**

In this action to restrain a retail grocery chain from selling milk below cost, affidavits of the Commissioner of Agriculture and others, to the effect that the purpose of the Milk Act was to prevent the use of milk by grocery stores as a "loss leader," are incompetent, since the legislative purpose cannot be established by such evidence.

**9. Same—**

G.S. 106-266.21 prohibits the sale of milk below cost with the purpose on the part of the seller to injure, harass or destroy competition in the marketing of milk, and the statute does not make the sale of milk below cost a violation in the absence of such illegal purpose.

**10. Same—**

The provisions of G.S. 106-266.21 making proof of the sale of milk by a retailer below cost *prima facie* evidence of the purpose of such retailer to injure, harass or destroy competition in the marketing of milk, is not beyond the constitutional power of the Legislature.

**11. Same—**

The illegal purpose proscribed by G.S. 106-266.21 is more than a mere intent to attract customers from those who are actual or potential customers of a rival, since all successful competition necessarily harasses to some degree others engaged in the same business activity in the same territory, and our economic system is built upon the theory that such competition is desirable; the illegal purpose constituting a violation of the statute is a malevolent purpose to eliminate a rival or so hamper him as to achieve, or approach, a monopoly, and thus control prices to the harm of the public.

**12. Constitutional Law § 6;   Monopolies § 1—**

The use of a "loss leader" as a competitive device in the retail grocery business is not generally unlawful and may not generally be restrained unless in violation of a contract permitted under the Federal Fair Trade Act, and in this State the Legislature has not prohibited such practice as contrary to public policy, and such determination is as binding on the

courts of this State as a contrary legislative determination is binding on the courts of other states having such legislative policy.

**13. Pleadings § 19—**

Upon a demurrer for failure to state a cause of action, a complaint must be liberally construed in favor of the pleader.

**14. Agriculture § 17—**

In this suit to enjoin defendant retailer from selling milk below cost, allegations that defendant was so selling milk for the purpose of destroying competition *is held* sufficient as against demurrer.

**15. Appeal and Error § 5—**

Upon appeal from an order granting an interlocutory injunction, the Supreme Court is not bound by the findings of fact made by the court below, but may review the evidence and find facts for itself.

**16. Agriculture § 17— Evidence held not to sustain finding that defendant was selling milk below cost to create monopoly.**

In this action to enjoin defendant retailer from selling milk below cost, evidence that defendant operates a supermarket chain, that it sold milk below cost but limited the purchase of each customer to one half gallon, that there was no competition between retail grocery stores and other types of distributors of milk, and that the use of milk as a "loss leader" is an accepted merchandising practice in marketing chains, etc., *is held* to compel the conclusion that the purpose of defendant in selling milk below cost was not to monopolize the business of selling milk in grocery stores, or elsewhere, but was to attract customers in the hope that they would purchase other items in sufficient volume to yield the defendant a profit from its entire operation, and since the sale of milk below cost for such purpose is not a violation of G.S. 106-266.21, it was error to enjoin defendant from doing so.

APPEAL by defendant from *Hobgood, J.,* at the 12 September 1966 Civil Session of ALAMANCE.

The plaintiff sued to enjoin the defendant from selling milk "below cost, as that term is defined in the statute, for the purpose of injuring, harassing or destroying competition in violation of G.S. 106-266.21, as amended."

The complaint alleges:

The defendant is engaged in the retail grocery business in Alamance and nearby counties under the name of Big Bear Supermarkets and sells milk and other food products; it "advertised and sold to the public a large number of half-gallons of milk at a price of 39 cents per half-gallon, plus sales tax"; which price was "below cost as that term is defined in G.S. 106-266.21, as amended (said milk having been purchased by defendant at a price of 55 cents per half-gallon)"; such sale was "for the purpose of injuring, harassing or destroying competition, to wit, others selling milk and other food products at retail and others operating supermarkets and retail

grocery stores within the trading area of defendant's said stores"; in furtherance of its plan so to sell milk, "the defendant caused newspaper advertisements to be published in * * * newspapers circulated in said counties * * * advertising the sale of half-gallon cartons of fresh milk at 39 cents"; and it "intends and plans to continue selling milk below cost," in violation of the said statute, and "it is necessary in order to protect the public interest and in order to prevent further violations of said statute by the defendant that an injunction be issued * * * enjoining the defendant from further violations of said statute."

, A temporary restraining order was issued and the defendant was ordered to appear and show cause why the injunction should not be continued to the final hearing of the matter in the superior court.

Prior to the hearing on the order to show cause, the defendant filed its answer admitting that at its stores it advertised and sold to the public a large number of half-gallons of milk at a price of 39 cents per half-gallon, plus sales tax, which price was below cost, but denying that such sales were for the purpose of "injuring, harassing or destroying competition." The answer also admits the publication of newspaper advertisements advertising the sale of half-gallon cartons of fresh milk at 39 cents. As a further answer, the defendant alleges that in such advertisements it advertised the sale of half-gallon cartons of milk, as well as other items, at less than cost as "loss leaders" for the purpose of attracting customers into its stores so that they would purchase other items in addition to those so advertised. It is alleged that such advertisements and sales for such purpose are "in accordance with the ordinary, usual and accepted method of merchandising by supermarkets and other retail grocery stores"; and were "not for the purpose of destructive competition and was not with the intent to injure, harass or destroy competition with others selling milk and other food products at retail and others operating supermarkets and retail grocery stores within the trading area of defendant's stores."

At the hearing upon the order to show cause, the defendant demurred ore tenus to the complaint, which demurrer was overruled. The matter was then heard upon affidavits. The trial court entered an order containing its findings of fact and conclusions of law, and continuing the preliminary injunction in effect until the final hearing of the cause in the superior court. It is from this order that the defendant appeals.

The court found that the defendant is engaged in the retail grocery business and had made sales and published advertisements, as alleged in the complaint, the advertisements stating, "Choice of any brand of fresh MILK — ½ GALLON CARTON 39¢ — LIMIT ONE

MILK COMMISSION v. FOOD STORES.

½ GAL. PER CUSTOMER PLEASE!" The court also found that the defendant so sold the milk "as a loss leader, for the purpose of attracting customers away from its competitors and luring them into defendant's stores; that the luring of said customers away from its competitors would naturally tend to harass or injure the defendant's competitors and the court finds that the sale of milk by defendant below cost was made for the purpose of injuring, harassing or destroying competition." The court further found: "There has been a stated decrease in the number of Grade A milk producers in North Carolina in recent years. There is a growing shortage of milk in North Carolina and in the nation. Producer and consumer prices for milk in North Carolina are in line with average prices in the southeastern portion of the United States." It further found that "the widespread use of milk as a loss leader would be likely to create a chaotic condition in the marketing of milk which would be contrary to the public interest in view of the perishable nature of milk," and that "it is in the public interest for the said injunction to be continued until the final hearing of this cause."

The assignments of error brought forward into the appellant's brief, others being deemed abandoned, are: (1) The overruling of the demurrer *ore tenus;* (2) the findings and conclusions that the sale of milk as a "loss leader" would naturally tend to harass or injure competition and that the sales by the defendant below cost were made for the purpose of "injuring, harassing or destroying competition"; and (3) the signing of the order continuing the injunction.

One of the affidavits introduced by the plaintiff shows that on July 28 and 29, 1966, the defendant's stores sold a total of 4,107 half-gallons of milk, on August 4 and 5 (the days on which the sales were made below cost), sold 14,611 half-gallons, and on August 11 and 12 sold 4,495 half-gallons. Sales of milk by "major stores competing" with the defendant in the same cities totaled 8,631 half-gallons on July 28 and 29, 7,932 on August 4 and 5, and 8,543 on August 11 and 12. That is, on the two days of "loss leader" selling, the defendant sold approximately 10,000 half-gallons more than it sold on days when its prices were not below cost, whereas on those days its "major" competitors sold only some 700 half-gallons less than on the other days. The explanation of the remaining 9,300 half-gallons of additional sales by the defendant is not indicated by the evidence.

Other affidavits introduced by the plaintiff tend to show that the defendant was advised of the provisions of the Milk Commission law following the appearance of its newspaper advertisement, and its president thereupon stated that the defendant was "going to use milk as a loss leader by selling it below cost at 39 cents per half-gallon."

The affidavit of Honorable James A. Graham, Commissioner of Agriculture of the State of North Carolina, states:

> "[T]he North Carolina Milk Commission sets minimum prices to be paid to dairy farmers for their milk, but does not establish prices at any other level; that the law gives the Commission the power in certain situations to set the price of milk at other levels, but the Commission has never found it necessary or advisable to take control of milk prices at other levels; that producer and consumer prices for milk in North Carolina are in line with average prices in the rest of the southeastern portion of the United States * * *"

This affiant, and others, expressed his opinion that the enforcement of G.S. 106-266.21 is in the public interest and that the widespread use of milk as a loss leader would create a chaotic condition which would have a depressing effect upon producer prices and cause many producers to go out of business.

The defendant introduced 15 affidavits by owners or operators of other supermarkets or retail stores of various sizes and locations in the trading area served by the defendant's stores. Each of these stated:

> "The retail sale of any food or milk product below cost as a 'loss leader' is an accepted and customary practice among supermarkets and other retail grocery stores, is not for the purpose of destructive competition with other retail grocers, and is not intended and does not injure, harass or destroy competition among other supermarkets and retail grocery stores. *The retailer of milk cannot and does not compete with any distributor or producer-distributor of milk.*" (Emphasis added.)

Each of these affiants stated that the advertisements and sales by the defendant, of which the plaintiff complains, "did *not* injure, harass or destroy competition among others selling milk and other food products at retail and particularly the business of your affiant." (Emphasis added.)

The plaintiff offered no affidavit from any operator or owner of any grocery store stating that the business of such affiant, or any other person, had been injured, harassed or destroyed or threatened with such injury, harassment or destruction by such advertisement and sales by the defendant.

*Morgan, Byerly, Post & Keziah for defendant appellant.*
*Holding, Harris, Poe & Cheshire for plaintiff appellee.*

LAKE, J. The act creating the Milk Commission was first before this Court in *Milk Commission v. Galloway*, 249 N.C. 658, 107 S.E. 2d 631, in which an order of the Commission fixing a uniform hauling charge to the producer by the processor for the transportation of milk from the farm to the processing plant was sustained. Parker, J., now C.J., speaking for the Court, said:

> "The considerations which impelled the General Assembly to adopt the Act were found in its preamble on page 1323, Acts of 1953. * * * Among the facts set forth in the preamble to the Act are these: 'Milk is a primary and necessary food for the children and adult population of the State. * * * [I]t is necessary to suppress unfair, unjust and destructive trade practices which are now being carried on in the production, marketing and distribution of milk and which tends to create a hazardous and dangerous condition with reference to the health and welfare of the people of the State.' Other facts stated in the preamble, as well as the Act itself, make it plain that the General Assembly was also concerned with suppressing unfair and destructive trade practices, and with stabilizing the milk industry, *so as to enable the producers to secure a fair price for their milk*. These recitals in the preamble set the framework for the legislation." (Emphasis added.)

Since *Nebbia v. New York*, 291 U.S. 502, 54 S. Ct. 505, 78 L. Ed. 940, it has been recognized that the Fourteenth Amendment to the Constitution of the United States does not forbid a state to confer upon an administrative agency the power to fix minimum and maximum retail prices to be charged for the sale of milk in grocery stores to consumers for the purpose of assuring the steady flow of an adequate supply of clean, wholesome milk from the producing farms to the consumer. In that case, Mr. Justice Roberts, speaking for the Court, said:

> "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. * * *
>
> "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed

to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. * * * And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary and discriminatory it does not lie with the courts to determine that the rule is unwise. * * *

"The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

*Milk Commission v. Galloway, supra,* establishes that neither Article I, § 7, nor Article I, § 17, of the Constitution of North Carolina, forbids the Legislature of this State to confer upon the Milk Commission authority to fix a uniform rate for the transportation of milk from the farm to the processing plant so as to enable the producers of milk to secure a fair price for their product. This Court there recognized the relation between such transportation charge and the assurance to the producers of milk of a fair price for that which they sell. It also recognized, as the Supreme Court of the United States had done in *Nebbia v. New York, supra,* that the Legislature might reasonably conclude that the maintenance of a fair price to the producer of milk is necessary to the assurance of an adequate supply of milk produced, transported and marketed under sanitary conditions. The constitutionality of the entire Milk Commission Act was not before this Court in the *Galloway* case, *supra,* and has never been determined by this Court. It is not before us in the present case.

The act must be construed in the light of its objective, which the *Galloway* case, *supra,* states. It empowers the Commission "to investigate all matters pertaining to the production, processing, storage, distribution, and sale of milk for consumption," and "to supervise and regulate the transportation, processing, storage, distribution, delivery and sale of milk for consumption." G.S. 106-266.8(2), (3). The Commission has not determined that conditions surrounding the production and marketing of milk in this State require a fixing of the price to be charged by a retail grocery store for the sale of milk to consumers in order to accomplish the purposes for

which the act was adopted. The Commission has not undertaken to fix the price to be charged in such a sale. Consequently, its authority to do so is not now before us. The affidavit of Honorable James A. Graham, Commissioner of Agriculture, offered in evidence by the plaintiff, states "[T]he North Carolina Milk Commission sets minimum prices to be paid to dairy farmers for their milk, but does not establish prices at any other level."

The question before us requires the construction of G.S. 106-266.21, which provides:

> "The sale of milk by any distributor or producer-distributor or retailer below cost for the purpose of injuring, harassing or destroying competition is hereby prohibited. At any hearing or trial on a complaint under this section, evidence of sale of milk by a distributor or subdistributor or retailer below cost shall constitute *prima facie* evidence of the violation or violations alleged, and the burden of rebutting the *prima facie* case thus made, by showing that the same was justified in that it was not, in fact, made below cost or that it was not for the purpose of injuring, harassing or destroying competition, shall be upon the person charged with a violation of this section. * * * The *prima facie* case of a violation of this section, made by proof of sale below cost, may be rebutted by proof of any of the following facts * * *"

The provision in this section of the act that the statutory *prima facie* case of violation may be rebutted by proof of specified circumstances, none of which applies to the present case, does not mean that these are the only circumstances which may be relied upon to rebut such *prima facie* proof of violation. See *Milk Commission v. Dagenhardt*, 261 N.C. 281, 134 S.E. 2d 361. To construe the statute otherwise would raise a serious question as to its constitutionality and it is well settled that a statute will not be construed so as to raise such question if a different construction, which will avoid the question of constitutionality, is reasonable. *State v. Barber*, 180 N.C. 711, 104 S.E. 760; *Labor Board v. Jones & Laughlin*, 301 U.S. 1, 57 S. Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352, 1361; *Crowell v. Benson*, 285 U.S. 22, 52 S. Ct. 285, 76 L. Ed. 598; *Fed. Trade Comm. v. Amer. Tobacco Co.*, 264 U.S. 298, 44 S. Ct. 336, 68 L. Ed. 696, 32 A.L.R. 786; *Re Keenan*, 310 Mass. 166, 37 N.E. 2d 516, 137 A.L.R. 766, 773; 16 Am. Jur. 2d, Constitutional Law, § 146; 16 C.J.S., Constitutional Law, § 98(b).

It is well settled in this State that it is within the power of the Legislature to change the rules of evidence and, within constitutional limits, to provide that the proof of one fact shall be deemed

*prima facie* evidence of a second fact. *Drainage Commissioners v. Mitchell,* 170 N.C. 324, 87 S.E. 112; *State v. Dowdy,* 145 N.C. 432, 58 S.E. 1002; *State v. Barrett,* 138 N.C. 630, 50 S.E. 506. Notwithstanding the contrary opinion of Professor Wigmore, set forth at length in the *Barrett* case, *supra,* it is now also well established in this State, and in other jurisdictions, that the exercise of such power by the Legislature is subject to the limitation that there must be such relation between the two facts in human experience that proof of the first may reasonably be deemed some evidence of the existence of the second. *Drainage Commissioners v. Mitchell, supra; State v. Dowdy, supra; Tot v. United States,* 319 U.S. 463, 63 S. Ct. 1241, 87 L. Ed. 1519; *Bandini Co. v. Superior Court,* 284 U.S. 8, 52 S. Ct. 103, 76 L. Ed. 136, 78 A.L.R. 826; *Mobile, J. & K. C. R. R. v. Turnipseed,* 219 U.S. 35, 43, 31 S. Ct. 136, 55 L. Ed. 78; *People v. Pay Less Drug Store,* 25 Cal. 2d 108, 153 P. 2d 9; *State v. Kelly,* 218 Minn. 247, 15 N.W. 2d 554; Anno., 162 A.L.R. 495, 505; 29 Am. Jur. 2d, Evidence, § 10. There are many circumstances in addition to those specified in the above statute, which would tend to disprove an intent to injure, harass or destroy competition by a sale of an article at less than its cost to the seller. To deprive the seller of the right to disprove the intent which is part of the conduct forbidden by the statute, by proof of such other circumstances, would raise grave doubt as to the constitutionality of the provision as an arbitrary interference with the liberty of contract. See 29 Am. Jur. 2d, Evidence, § 11. We, therefore, hold that one charged, either in a civil or in a criminal proceeding, with the violation of G.S. 106-266.21 may rebut the statutory *prima facie* case, resulting from proof of a sale of milk at less than cost, by proof of any fact from which absence of the evil intent may be rationally inferred.

As this Court noted in *Milk Commission v. Galloway, supra,* the purpose of the act creating the Milk Commission was to protect the public interest in a sufficient, regularly flowing supply of wholesome milk and, to that end, to provide a fair price to the milk producer for his product. G.S. 106-266.21, though added to the original act by an amendment at a subsequent session, must be construed in the light of that purpose.

While the cardinal principle of statutory construction is that the words of the statute must be given the meaning which will carry out the intent of the Legislature, that intent must be found from the language of the act, its legislative history and the circumstances surrounding its adoption which throw light upon the evil sought to be remedied. Testimony, even by members of the Legislature which adopted the statute, as to its purpose and the construction intended to be given by the Legislature to its terms, is not competent evidence

upon which the court can make its determination as to the meaning of the statutory provision. *D & W, Inc., v. Charlotte,* 268 N.C. 577, 151 S.E. 2d 241; *Goins v. Indian Training School,* 169 N.C. 736, 86 S.E. 629. Consequently, the affidavits introduced by the plaintiff, purporting to show that it was the purpose of the Legislature to prevent the use of milk by grocery stores as a "loss leader," were not competent for that purpose and must be disregarded.

It is obvious, from the reading of this act in its entirety, that the Milk Commission was not established as an agency to regulate competition among retail grocery stores *per se.* The Commission was established as a State agency to protect the interest of the public in a regularly flowing supply of wholesome milk and is authorized, for that purpose, and that purpose only, to regulate, under proper circumstances and to a proper degree, the price of milk. It is the destruction of competition in the handling of milk, not in the grocery business generally, which G.S. 106-266.21 was designed to prevent. The Milk Commission is not to be deemed a legislatively appointed guardian for the retail grocery business. G.S. 106-266.21, which is part of the Milk Commission Act, is not to be given a construction leading to such result.

The conduct prohibited by G.S. 106-266.21 is the sale of milk, as defined in G.S. 106-266.6, below cost, as defined in G.S. 106-266.21, coupled with the purpose on the part of the seller to injure, harass or destroy competition in the marketing of milk. The evil motive or purpose is an essential element of the offense, as truly as is the sale of milk below cost. There is no violation of this statute unless both elements concur. By virtue of the statute, evidence of the sale below cost is evidence of the wrongful purpose, but it is evidence only. Standing alone, it permits but does not compel a finding of the necessary motive or purpose. *Milk Commission v. Dagenhardt, supra; State v. Wilkerson,* 164 N.C. 431, 79 S.E. 888. It cannot be said that there is no rational basis for inferring the existence of a purpose to injure, harass or destroy competition in the marketing of milk from a sale of milk below the cost thereof to the seller. Thus, the statute making proof of such sale *prima facie* evidence of such purpose is not beyond the constitutional power of the Legislature. The statute does not, however, make a sale of milk below cost in and of itself a violation of the law.

The very purpose and nature of competition involves the intent to attract to one's self customers who might otherwise trade with a rival producer or seller. All successful competition necessarily harasses to some degree others engaged in the same business activity in the same territory. Our economic system is built upon the theory

that this is a desirable spur to better service and lower cost to the consumer. The results achieved through long adherence to this system indicate it has merit exceeding that of a system controlled by either a private monopoly or a governmental administrator. The purpose required to establish a violation of G.S. 106-266.21 is more than a mere intent to attract customers from those who are actual or potential customers of a rival. The intent or purpose required to show a violation of this statute is a malevolent purpose to eliminate a rival or so hamper him as to achieve, or approach, a monopoly and thus control prices to the harm of the public after the rival is eliminated or crippled. Unquestionably, trade practices, including price cutting, designed to accomplish such an end may be forbidden by statute. *Bennett v. R. R.*, 211 N.C. 474, 191 S.E. 240; *State v. Coal Co.*, 210 N.C. 742, 188 S.E. 412; *Manning v. R. R.*, 188 N.C. 648, 125 S.E. 555.

Many states have enacted statutes forbidding, as unfair competition, the sale of any merchandise at less than cost with the intent thereby to induce the purchase of other merchandise or to divert trade from a competitor. The Supreme Court of the United States has sustained such legislation. *Safeway Stores v. Oklahoma Grocers*, 360 U.S. 334, 79 S. Ct. 1196, 3 L. Ed. 2d 1280. See also: *Old Dearborn Co. v. Seagram Corp.*, 299 U.S. 183, 57 S. Ct. 139, 81 L. Ed. 109; *Wholesale Tobacco Dealers B. v. National Candy & T. Co.*, 11 Cal. 2d 634, 82 P. 2d 3; Anno., 118 A.L.R. 506. In the *Safeway Stores* case, Mr. Justice Frankfurter, speaking for the Court, said:

> "One of the chief aims of state laws prohibiting sales below cost was to put an end to 'loss-leader' selling. The selling of selected goods at a loss in order to lure customers into the store is deemed not only a destructive means of competition; it also plays on the gullibility of customers by leading them to expect what generally is not true, namely, that a store which offers such an amazing bargain is full of other such bargains."

In *Wholesale Tobacco Dealers B. v. National Candy & T. Co.*, *supra*, Chief Justice Waste, speaking for the Supreme Court of California, said:

> "The use of 'loss leaders' for the purpose of injuring a competitor has been condemned by many economists. It has been urged that their use is injurious to the consumer in that the losses so sustained will either have to be made up by higher prices charged on other commodities, or by the enforcing of various economies, such as the lowering of wages, discharge of

employees, lowering of rents, depressing the wholesale prices, etc. It has many times been urged that such practices are destructive of competition and tend to create monopolies."

In *Old Dearborn Co. v. Seagram Corp., supra,* Mr. Justice Sutherland, speaking for the Court, in sustaining the right of a state to enact "fair trade" legislation, said:

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; * * * True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned."

The North Carolina Legislature, on the contrary, has not seen fit to adopt as the policy of this State the prohibition of the sale of any merchandise below cost as a "loss leader" to attract customers to the store of the seller in the hope that they will buy there other commodities in sufficient volume to enable the seller to overcome the loss incurred in the sale of the article used as a "loss leader." This determination by the Legislature is also conclusive upon the courts. Thus, the use of "loss leaders" as a competitive device in the retail grocery business generally is not unlawful and may not be restrained, in the absence of a contract permitted under the Fair Trade Act such as was sustained in *Lilly & Co. v. Saunders,* 216 N.C. 163, 4 S.E. 2d 528, 125 A.L.R. 1308.

G.S. 106-266.15 provides that in the event of violation of any provision of the Milk Commission Act, the Commission may apply to the courts "for relief by injunction, *if necessary, to protect the public interest* without being compelled to allege or prove that any adequate remedy at law does not exist." (Emphasis added.)

The public interest sought to be protected by G.S. 106-266.21 is the public's interest in the regular flow of an adequate supply of wholesome milk from the producer to the consumer, not a possible public interest in the protection of retail grocery stores from the use by other retail grocery stores of milk as a "loss leader." Since the Commission, under its statutory authority, has fixed the minimum price to be paid to the producer by the distributor, a circumstance

which was not present in *Nebbia v. New York, supra* (see dissenting opinion by Mr. Justice McReynolds, 89 A.L.R. 1484, 1487), there is no reasonable basis for a finding by the courts that a sale of milk by a retail grocery store at less than the cost of the milk to it will endanger the public's interest in an adequate flow of wholesome milk, nothing else appearing.

Upon a demurrer for failure to state a cause of action, a complaint must be liberally construed in favor of the pleader. *Patterson v. Lynch, Inc.,* 266 N.C. 489, 146 S.E. 2d 390; *Homes, Inc., v. Holt,* 266 N.C. 467, 146 S.E. 2d 434; *Hall v. Coble Dairies,* 234 N.C. 206, 67 S.E. 2d 63; *Wells v. Wells,* 227 N.C. 614, 44 S.E. 2d 31; *Hearn v. Erlanger Mills, Inc.,* 219 N.C. 623, 14 S.E. 2d 675. So construed, we find in this complaint an allegation of a sale of milk below cost for the purpose of destroying competition in the sale of milk. While the allegation that the issuance of an injunction is necessary in order to protect "the public interest," standing alone, is a mere conclusion of the pleader, it may be inferred from the preceding allegation as to the purpose to destroy competition in the sale of milk that the public interest alleged to require injunctive relief is the public's interest in monopoly free marketing of milk. We also interpret the allegation in the complaint that the defendant sold "milk" to mean it sold milk as defined in the highly restrictive definition contained in G.S. 106-266.6. We, therefore, hold that the demurrer *ore tenus* to the complaint was properly overruled.

Upon an appeal from an order granting an interlocutory injunction, this Court is not bound by the findings of fact made by the court below, but may review and weigh the evidence and find the facts for itself. *Milk Commission v. Dagenhardt, supra.*

The plaintiff's own evidence is not sufficient to support a finding that the sales of milk by the defendant were for the purpose of destroying competition in the marketing of milk. Milk was but one of many items listed in the newspaper advertisement published by the defendant and introduced in evidence by the plaintiff. Presumably, the price therein specified for each article named was such as to be attractive to the housewife. The advertisement specifically states that only one half-gallon of milk was to be sold at this price to a customer. This is not the action of one seeking to drive competitors from the milk business. The plaintiff's evidence also shows that while the defendant increased its sales of milk by 10,000 half-gallons for the two days in which the below cost selling took place, its principal competitors' aggregate sales declined only about 700 half-gallons for the two day period. It would appear that the primary effect of the defendant's action upon the flow of milk was to in-

crease the consumption of milk, not to divert the milk business from rival stores. This is not contrary to the public interest in the maintenance of an adequate supply of wholesome milk. There is no evidence from any competing seller of milk that he was injured, harassed or eliminated from competition for the milk market or would be so affected by the further sales of milk by the defendant at less than the cost thereof to the defendant.

The defendant's evidence, which is uncontradicted, is that there is no competition between retail grocery stores and other types of distributors of milk. The defendant's evidence is that the use of milk as a "loss leader" is an accepted merchandising practice among retail grocery stores and is not for the purpose of injuring, harassing or destroying competition among other supermarkets and retail grocery stores. Fifteen competing merchants stated in their affidavits, introduced by the defendant, that they had not been injured by the advertisement and sales in question.

We think that the record leads inescapably to the conclusion that the purpose of the defendant in selling milk below cost was not to monopolize the business of selling milk in grocery stores, or elsewhere, but was to attract customers to its stores in the hope that they would purchase there other items in sufficient volume to yield the defendant a profit from its entire operation. Since this is not a violation of G.S. 106-266.21, it was error to issue the injunction and the judgment so doing is hereby

Reversed.