IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-691

Filed 05 July 2023

Orange County, No. 17 CVS 166

ELIZABETH ZANDER and EVAN GALLOWAY, for themselves and all other persons similarly situated, Plaintiffs,

v.

ORANGE COUNTY, NC, and the TOWN OF CHAPEL HILL, Defendants.

Appeal by Plaintiffs from an Order entered 17 June 2022 by Judge Allen Baddour in Orange County Superior Court. Heard in the Court of Appeals 24 January 2023.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by William A. Robertson, Robert J. King, III, Daniel F. E. Smith, and Matthew B. Tynan, for Plaintiffs-Appellants.*

*Womble Bond Dickinson (US) LLP, by Sonny S. Haynes and James R. Morgan, Jr., for Defendants-Appellees.*

RIGGS, Judge.

Plaintiffs Elizabeth Zander and Evan Galloway appeal from a summary judgment order dismissing their class action complaint brought against Defendants

Orange County (the "County") and the Town of Chapel Hill[1] on behalf of persons: (1) who were assessed allegedly *ultra vires* school impact fees by the County (the "Feepayer Class"); or (2) who are allegedly entitled to a refund of some school impact fees due to a 2016 change in the fee schedule (the "Refund Class"). On appeal, Plaintiffs contend that the evidence conclusively establishes that both classes are entitled to relief and that there are no genuine issues of material fact for resolution at trial. After careful review, we agree that the County unlawfully included some costs not authorized by statute in calculating the impact fees and hold that the Feepayer Class is entitled to recoup the portion of the school impact fees that were assessed to cover those improper costs. However, because the evidence does not establish the amount of impact fees attributable to these impermissible costs, we remand the matter for further proceedings to determine the damages owed to the Feepayer Class. As to the Refund Class, we hold that the trial court properly granted summary judgment for the County because the forecast of evidence demonstrates that no refunds are owed under the applicable ordinance.

## I. FACTUAL AND PROCEDURAL HISTORY

**A. The Enabling Act**

In 1987, the General Assembly enacted a statute authorizing the County to

---

[1] The parties agreed at trial and in their briefs to this Court that any claims against the Town of Chapel Hill are subsumed into the claims against the County; as such, we omit further discussion of the Town of Chapel Hill from this opinion.

assess impact fees "to help defray the costs to the County of constructing certain capital improvements" necessitated by new residential development. 1987 N.C. Sess. Laws 617, ch. 460, § 17(b)(1) (hereinafter the "Enabling Act"). The Enabling Act defined "capital improvements" as follows:

> For purposes of this subsection, the term capital improvements includes the acquisition of land for open space and greenways, capital improvements to public streets, schools, bridges, sidewalks, bikeways, on and off street surface water drainage ditches, pipes, culverts, other drainage facilities, water and sewer facilities and public recreation facilities.

*Id.* § (b)(2).

The Enabling Act also established minimum procedures that the County must follow as it "endeavor[s] to approach the objective of having every development contribute" to a fund for capital improvements in a reasonable and fair manner. *Id.* § (c). Specifically, the County is required, "among other steps and actions," to:

> (1) Estimate the total cost of improvements by category (e.g., streets, sidewalks, drainage ways, etc.) that will be needed to provide in a reasonable manner for the public health, safety and welfare of persons residing within the County during a reasonable planning period not to exceed 20 years. The Board of County Commissioners may divide the County into two or more districts and estimate the costs of needed improvements within each district. These estimates shall be periodically reviewed and updated and the planning period used may be changed from time to time.
>
> (2) Establish a percentage of the total costs of each category of improvement that, in keeping with the objective set forth above, should fairly be borne by those paying the

impact fee.

> (3)  Establish a formula that fairly and objectively apportions the total costs that are to be borne by those paying impact fees among various types of developments. . . .

*Id.*  The Enabling Act was later amended in 1993 to define the word "costs" as including loan obligations, lease payments, and installment sale contracts connected with capital improvements.  1993 N.C. Sess. Laws 313, ch. 642, § 4(a).

**B.  Impact Fee Studies and Ordinances**

In 2003, the County enacted an ordinance designed to ensure adequate school capacity at specified service levels in the face of new development.  ORANGE COUNTY, N.C., CODE OF ORDINANCES §§ 15-88, 88.2 (2003).  The County began creating Schools Adequate Facilities Ordinance Technical Advisory Committee reports ("SAPFOTAC reports") to aid the process.  The SAPFOTAC reports were limited, however, insofar as they only estimated the need for entirely new schools by type without considering expansion of existing school facilities or the capacity needs of schools individually.

The County also sought assistance in calculating future capital improvement costs and impact fees from consultants TischlerBise.  In 2007, TischlerBise completed school impact fee reports (the "2007 Studies") for each school district operated by the County: (1) the Orange County School District ("OCSD"); and (2) the Chapel Hill-Carrboro School District ("CHCSD").  The 2007 Studies employed the "incremental expansion method" of estimating future capital improvement needs and attributable

impact fee assessments by: (1) establishing the capital cost per student at the County's desired level of service;[2] and (2) assessing that cost against different types of residential development based on their anticipated student generation, *i.e.*, the anticipated number of students added to the school system by each new residence type built.

First, TischlerBise identified the level of service by reference to the County's ordinances, which mandated the following levels of service by school type: 105% for elementary schools; 107% for middle schools; and 110% for high schools. From there, and based on current student enrollment data, TischlerBise calculated the capital improvements—such as acreage, building square footage, and number of portable classrooms—attributable to each individual student at the levels of service mandated by the County's ordinances. TischlerBise then estimated the current cost of each of these capital improvements per unit, *i.e.*, by acre, square foot, *etc.* Taking these numbers together, and after accounting for revenue credits attributable to non-impact fee funding sources, TischlerBise arrived at a net total capital improvement cost per individual student, separated by elementary, middle, or high school. Finally, TischlerBise calculated the maximum allowable impact fee for each residence type by

---

[2] The term "level of service," as used by both the County and TischlerBise, refers to enrollment as expressed by percentage, so a school operating at a service level above 100% is overcapacity and, if that overage exceeds the County's accepted level of service, capital expenditures are needed to meet this overage in demand and growth. Obviously, growth needs cannot be accurately assessed without an understanding of where the school system's current capacity and level of service are.

multiplying the net capital improvement cost per student by the number of elementary, middle, and high school students generated from each new type of house built. TischlerBise relied on the estimated student generation data for the 2006-2007 school year in arriving at the maximum allowable impact fees.

Stated differently, TischlerBise estimated future capital improvement needs by calculating how much it would cost in capital improvements to maintain adequate school capacity levels on a per-new-student basis: as each new residence was built, an impact fee would be assessed to cover the capital improvement cost of adding the students generated by the residence to the school system without negatively impacting capacity. TischlerBise then provided maximum allowable impact fees by development type based on these calculations.

TischlerBise included the following costs as "capital improvements" in drafting the 2007 Studies: (1) construction; (2) land acquisition; (3) portable/temporary classrooms; (4) support facilities; (5) buses; and (6) TischlerBise's consulting fee. For the five-year period beginning in 2008, TischlerBise estimated that the OCSD's "school local capital costs average approximately $6 million per year, or $30.4 million over five years," and the CHCSD's "school local capital costs average approximately $11.3 million per year, or $56.7 million over five years." The Reports advised the County that, based on these five-year estimates, assessing the maximum impact fees calculated by TischlerBise "would cover approximately 85 percent of [OCSD's] projected related capital improvement costs," and "approximately 84 percent of

[CHCSD's] projected related capital improvement costs." TischlerBise also calculated anticipated student enrollment and housing development increases for the ten-year period beginning in 2007, relying on historical development data from the past 10 years.[3]

Following receipt of the 2007 Studies, the County enacted impact fees at 32% of the maximum calculated by TischlerBise beginning in 2009; that percentage then increased to 40% in 2010, 50% in 2011, and 60% in 2012. The County never assessed impact fees at 100% of the maximum calculated by TischlerBise under the incremental expansion method.

In 2014, TischlerBise provided the County with a new student generation rate study. Then, in 2016, TischlerBise completed an updated set of impact fee studies (the "2016 Studies") that accounted for new dwelling types and student generation data. The 2016 Studies anticipated $19MM in future capital costs over the next five years for the OCSD and $23.28MM for the CHCSD, while again estimating the anticipated student enrollment and housing development increases for the next 10 years.

---

[3] To the extent the dissent takes issue with the methodologies employed by TischlerBise in arriving at the total estimated improvements over the five-year period from 2007 to 2012 and the anticipated student generation and development rates for the 10-year period from 2007 to 2017, the plain language of the Enabling Act does not establish a specific means by which the County must calculate anticipated needed capital improvement costs within a reasonable period of 20 years or less.

The County adopted new impact fee schedules following the release of the 2016 Studies to account for the new housing types captured therein. It also amended the impact fee ordinance to provide as follows:

> If the Schedule of Public School Impact Fees . . . is reduced due to an updated school impact fee study that results in changes to impact fee levels charged, no refund of previously paid fees shall be made. If the Schedule of Public School Impact Fees . . . is reduced due to reasons other than an updated school impact fee study, the difference between the old and new fees shall be returned to the feepayer . . . .

ORANGE COUNTY, N.C., CODE OF ORDINANCES § 30-35(e)(2) (2016) (hereinafter the "2016 Ordinance"). The new fee schedule resulted in the reduction of impact fees for some dwelling types and an increase for others. *Id.* The County did not offer refunds, reasoning that the impact fee reductions were "due to an updated impact fee study that result[ed] in changes to [the] impact fee levels charged[.]" *Id.*

**C. Plaintiffs' Suit**

Plaintiffs filed suit against the County on 6 February 2017, challenging the impact fee assessments and lack of refunds. On 3 March 2017, Plaintiffs filed an amended class action complaint alleging, *inter alia*, that: (1) the County failed to comply with the Enabling Act's fee-setting provisions and the fees were thus *ultra vires*; and (2) they were entitled to a refund due to the 2016 Ordinance's reduction in fees.

The trial court entered a case management order following class action certification. Under its terms, all motions for summary judgment were to be filed on or before 22 December 2021. Plaintiffs filed their motion for summary judgment on 30 November 2021, and the County did the same on 1 December 2021. Plaintiffs later filed an amended motion with exhibits on 22 December 2021, and the County followed suit on 1 February 2022. The County's amended motion for summary judgment did not include any substantive changes, and instead simply identified the pleadings and evidence on which the motion was based, including several affidavits with exhibits that were attached to the amended motion. Plaintiffs subsequently moved to strike the County's amended motion as untimely.

The above motions were heard on 14 March 2022. After taking the matter under consideration at the close of the hearing, the trial court entered a written order denying Plaintiffs' motion to strike and granting summary judgment for the County on 17 June 2022. Plaintiffs filed written notice of appeal on 28 June 2022.

## II. ANALYSIS

Plaintiffs raise several arguments on appeal, divided amongst the Feepayer and Refund Classes. As to the Feepayer Class, Plaintiffs contend that the County: (1) failed to estimate the total cost of improvements in accordance with the Enabling Act's rate-setting procedures; (2) included improper costs in calculating its impact fees; and (3) owe the Feepayer Class a full refund of all illegally assessed impact fees at 6% annual interest—totaling well in excess of $12MM—pursuant to N.C. Gen.

Stat. § 160D-106 (2021). For the Refund Class, Plaintiffs assert that the impact fee reductions in the 2016 Ordinance were not solely caused by the updated 2016 Studies and refunds are therefore owed under the 2016 Ordinance's refund provision. Both classes, Plaintiffs posit, are owed attorney's fees. Lastly, Plaintiffs challenge the trial court's denial of their motion to strike the County's amended summary judgment motion.

## A. Standards of Review

Orders granting summary judgment are reviewed *de novo* on appeal. *Bryan v. Kittinger*, 282 N.C. App. 435, 437, 871 S.E.2d 560, 562 (2022). Issues of statutory construction—including the construction of ordinances—raise questions of law subject to the same standard. *Thompson v. Union Cnty.*, 283 N.C. App. 547, 555, 874 S.E.2d 623, 630 (2022). We apply the *de novo* standard on review of a summary judgment order to determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c) (2021). A movant "bears the burden of bringing forth a forecast of evidence which tends to establish that there are no triable issues of material fact." *Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998) (citation omitted). If the movant meets this burden, "the nonmoving party must then produce a forecast of evidence demonstrating that the nonmoving party will be able to make out at least a *prima facie* case at trial." *Id.* (cleaned up).

We consider the evidence in the light most favorable to the nonmovant, and "any doubt as to the existence of an issue of triable fact must be resolved in favor of the party against whom summary judgment is contemplated." *Id.*

Rulings on motions to strike, including motions to strike affidavits, are reviewed more deferentially for abuse of discretion. *Blair Concrete Servs., Inc. v. Van-Allen Steel Co.*, 152 N.C. App. 215, 219, 566 S.E.2d 766, 768 (2002).

## B. Feepayer Class Claims

Plaintiffs present a tripartite argument on behalf of the Feepayer Class. First, Plaintiffs assert that the County, together with TischlerBise, failed to "[e]stimate the total cost of improvements by category (e.g., streets, sidewalks, drainage ways, etc.) that will be needed . . . during a reasonable planning period" and "estimate the costs of needed improvements within each [school] district" as required by the Enabling Act. Enabling Act § (c)(1). Second, Plaintiffs allege that the County's calculation of impact fees included costs beyond the "costs to the County of constructing certain capital improvements" authorized and defined by the Enabling Act. *Id.* § (b)(1); *see also id.* § (b)(2) (defining "capital improvements"). Finally, and assuming merit under their first two contentions, Plaintiffs claim that the impact fees must be refunded *in toto* with interest as "illegally imposed . . . fee[s] . . . for development or a development approval not specifically authorized by law" under N.C. Gen. Stat. § 160D-106. We address each contention in turn.

### 1. Procedural Compliance with the Enabling Act

In challenging the procedures used by the County to set its impact fees, Plaintiffs identify two purported infirmities that allegedly contravene the Enabling Act, namely that the County and TischlerBise: (1) failed to estimate anticipated total capital improvement costs of schools over a "reasonable planning period[,]" Enabling Act § (c)(1); and (2) failed to tie the impact fees to specific needs for identified new schools, *id.* Neither assertion withstands scrutiny.

In rejecting Plaintiffs' first challenge, we note that the impact fee ordinance itself plainly states a 10-year planning period was used in setting the impact fee rates: "[f]ollowing their collection, funds shall be expended within ten (10) years, *the time frame coinciding with the public school facilities capital improvements program (CIP) school impact fee period.*" ORANGE COUNTY, N.C., CODE OF ORDINANCES § 30-35(c)(5) (2008) (emphasis added). Though Plaintiffs assert this could not have been the case because the County's 30(b)(6) designee and Director of Planning and Inspections testified that TischlerBise did not use a 10-year planning period, this overlooks the fact that *the County Board of Commissioners is not TischlerBise.*[4] The County was

---

[4] To be clear, Plaintiffs explicitly claim that the County "confirm[ed] through its 30(b)(6) witness that a 10-year planning period was *not* used," and thus the 10-year planning period established by ordinance could not have been employed by the County. But Plaintiffs—and the dissent—overstate the witness's testimony; while he indeed testified that TischlerBise (rather than the County) did not use a 10-year planning period, when subsequently asked whether planning periods of less than ten years were used by the consultants, the witness testified that he would have to "look through the [TischlerBise] report[s] again" to identify the Reports' planning period because he "d[id] not know the answer" from memory. And, though he could not recall the exact planning period used, nothing suggests it was in excess of 20 years, and the witness ultimately testified that "[w]hat I do know is that [the planning period used by TischlerBise] was a reasonable period of time to assess the

still free to use the 10 years of student generation and development estimates included in the Reports to arrive at the total anticipated needed capital improvement costs for the 10-year planning period established by ordinance. The County acknowledged as much in its responses to Plaintiffs' interrogatories: when asked to identify the planning period found in TischlerBise's 2007 Reports, the County identified the Reports' "projection of school improvement costs to 2012 *and* 2017." (Emphasis added). Contrary to Plaintiffs' and the dissent's arguments, the cited testimony from the County's 30(b)(6) designee does not speak to *the County's* use of the 2007 Reports' 10-year student generation and housing development estimates, alongside the Reports' estimated capital improvement costs per student, to anticipate total capital improvement costs to schools over the 10-year planning period stated in the ordinances. Thus, the County's reliance on TischlerBise's 2007 Studies does not disprove or contradict the County's use of a 10-year planning period.

Further, even if the County did not employ the ordinance's 10-year planning period and otherwise relied exclusively on TischlerBise's 2007 Reports to comply with

---

impacts for the public health, safety, and welfare of persons in the county." On the whole, the witness's testimony establishes that TischlerBise *did* use a planning period, but that the witness could not remember exactly what timespan it covered; conversely, the excerpted testimony did not address at all what planning period *the County* used. We are not, contrary to the assertion by the dissent, relying on the distinction between the County's witness and TischlerBise to "discount" any failure by the County to use a planning period. We instead simply recognize that the evidence, contrary to Plaintiffs' and the dissent's contentions, shows that the witness was testifying to his lack of definite knowledge concerning TischlerBise's utilized planning period rather than completely disclaiming any use of: (1) a planning period by TischlerBise; or (2) a 10-year planning period, consistent with the ordinance, *by the County*.

the Enabling Act—as Plaintiffs assert and the dissent entertains—the Reports themselves estimated the total anticipated capital improvement costs to schools for a five-year period, stating OCSD's "school local capital costs average approximately $6 million per year, or *$30.4 million over five years*," and the CHCSD's "school local capital costs average approximately $11.3 million per year, or *$56.7 million over five years*." Again, the County's discovery responses explicitly identified this five-year estimate as a planning period used by TischlerBise in the 2007 Report. That the County's 30(b)(6) designee did not know and could not recall exactly which planning period TischlerBise used in its 2007 Reports does not contradict, impeach, or otherwise have evidentiary relevance to TischlerBise's clear estimate of the total anticipated capital improvement costs of schools over a five-year period in the Reports themselves.

The dissent notes that there is conflicting evidence as to whether a 10-year planning period or some other planning period was used. But genuine issues of fact are not always *material* to the litigation such as to preclude summary judgment. *See Lowe v. Bradford*, 305 N.C. 366, 329, 289 S.E.2d 363, 366 (1982) ("An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." (citation omitted)). As explained above, the Feepayers and the dissent have not identified any evidence showing that the County did not utilize a 10-year planning period, let alone that *no* planning period of less than 20 years was used (or that a planning period

exceeding 20 years was applied) such that the Enabling Act was violated. Thus, assuming there is a genuine issue as to whether the County used a five-year or a 10-year planning period based on its 30(b)(6) designee's testimony, that fact is not *material* to the Feepayer's claims because, whichever way that issue is resolved, it cannot establish non-compliance with the Enabling Act. We respectfully disagree with the dissent that a genuine issue of *material* fact exists as to this portion of the Plaintiffs' claims.

Plaintiffs' second procedural violation argument fares no better than their first. Under their reading of the Enabling Act, the County was required to predict and itemize each new school, facility expansion, or other capital improvement project needed over the planning period. But the plain language of the Enabling Act imposes no such specificity requirement. Instead, the Enabling Act broadly tasked the County with "*endeavor[ing] to approach* the objective of having every development contribute . . . that development's fair share of the costs of the capital improvements that are needed in part because of that development." Enabling Act § (c) (emphasis added). Consistent with that open-ended mandate, all that the Enabling Act necessitates is the County "[e]stimate the total cost of improvements *by category* (e.g., streets, sidewalks, drainage ways, etc.) that will be needed" over the planning period as between the two school districts. *Id.* § (c)(1) (emphasis added). The parenthetical following the word "category" makes clear that "schools" is a category to itself. *See id.* § (b)(2) (defining "capital improvements" to include "capital improvements to

*public streets*, *schools*, bridges, *sidewalks*, bikeways, *on and off street surface water drainage ditches*, pipes, culverts, other drainage facilities, water and sewer facilities and public recreation facilities" (emphasis added)); *see also State v. Tew*, 326 N.C. 732, 739, 392 S.E.2d 603, 607 (1990) ("All parts of the same statute dealing with the same subject are to be construed together as a whole, and every part thereof must be given effect if this can be done by any fair and reasonable interpretation." (citation omitted)). As such, the County was merely required to estimate the total cost of school capital improvements between the two districts—no greater specificity or itemization is compelled by the Enabling Act. And even if more granularity was necessary, the 2007 Studies included such detail by breaking down school capital improvement expenses by type into land acquisition costs, construction costs, and more.

Contrary to Plaintiffs assertion that the 2007 Studies relied on by the County did not estimate the total cost of capital improvements to schools as between the two school districts, those Studies expressly estimated that OCSD would incur a total of $30.4MM in school capital improvement costs over five years and CHCSD a total of $56.7MM over the same span, while including additional predictive data for the following 10 years. Thus, Plaintiffs have not put forth any evidence demonstrating that the County failed to comply with the procedural requirements of the Enabling Act.

### 2. *The Impact Fee Calculations Included Impermissible Costs Beyond "Capital Improvements to . . . Schools"*

Plaintiffs next assert that to the extent the County did engage in any capital improvement calculations, those calculations included impermissible costs, namely: (1) land acquisition; (2) support and transportation facilities; (3) portable classrooms; (4) buses; and (5) TischlerBise's consultant fee. Determining whether the County could appropriately include these items in its estimations and calculations of school impact fees requires us to construe and apply the following definition of "capital improvements" provided by the Enabling Act:

> For purposes of this subsection, the term capital improvements includes the acquisition of land for open space and greenways, capital improvements to public streets, schools, bridges, sidewalks, bikeways, on and off street surface water drainage ditches, pipes, culverts, other drainage facilities, water and sewer facilities and public recreation facilities.

Enabling Act § (b)(2). We are obliged to apply statutorily provided definitions when interpreting legislative acts. *In re Clayton-Marcus Co.*, 286 N.C. 215, 219, 210 S.E.2d 199, 202 (1974).

#### a. *Land Acquisition and Portable Classrooms*

The parties first dispute whether purchasing real property constitutes a "capital improvement to . . . schools." Enabling Act § (b)(2). Plaintiffs note that land acquisition is expressly included as it relates to "open space and greenways" but is otherwise absent from the definition, *id.*, contending that land acquisition is therefore

excluded from the other listed categories. *See, e.g., Evans v. Diaz*, 333 N.C. 774, 779-80, 430 S.E.2d 244, 247 (1993) ("Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list." (citations omitted)). However, this overlooks the definitional list's recursive quality; in the context of schools, the General Assembly used the term "capital improvements" to define itself, providing that "the term capital improvements includes . . . capital improvements to . . . schools[.]" Enabling Act § (b)(2). Thus, we interpret the statutory definition to: (1) identify the several categories of capital improvements for which impact fees may be assessed, *e.g.*, schools; and (2) *enlarge* the common definition of "capital improvements" to include land acquisition for projects that otherwise would not involve any improvement-related expenditures—like undeveloped "open space"—while maintaining the ordinary definition as it applies to schools and the other identified categories.

The ordinary definition of "capital improvement" includes land acquisition in addition to construction. *See Capital Improvement, Black's Law Dictionary* (11th ed. 2019) ("An outlay of funds to *acquire* or improve a fixed asset. – Also termed capital improvement; capital outlay." (emphasis added)). This also comports with how the term is used elsewhere in our General Statutes, particularly when referring to the State's powers to pay for and pursue "capital improvements." *See, e.g.*, N.C. Gen. Stat. § 143C-1-1(d)(5) (2021) (defining "capital improvement" under the State Budget

- 18 -

Act as "[a] term that *includes real property acquisition*, new construction or rehabilitation of existing facilities, and repairs and renovations over one hundred thousand dollars ($100,000) in value" (emphasis added)); N.C. Gen. Stat. § 162A-211(a)(1) (2021) (defining "costs of constructing capital improvements" for purposes of sewer and water systems development fees as including both "[c]onstruction contract prices" and "[l]and acquisition cost"). Further, this Court has described the purchase of land as a proper expenditure from a county's "capital improvement fund." *See generally Davis v. Iredell Cnty.*, 9 N.C. App. 381, 176 S.E.2d 361 (1970) (upholding a county's use of "capital improvement fund" monies to buy land for a new judicial complex on constitutional and statutory grounds). Because the purchase of land falls within the ordinary meaning of the term "capital improvements," and such meaning accords with both statutory and case law, we hold that the Enabling Act allowed the County to assess school impact fees to buy new land for schools. *Cf. Fid. Bank v. N.C. Dep't of Revenue*, 370 N.C. 10, 20, 803 S.E.2d 142, 150 (2017) (defining the word "interest" in a statute based on a common dictionary definition that was "consistent with the manner in which 'interest' is used in other statutory provisions and judicial decisions").

Portable classrooms, too, appear to be "capital improvements to . . . schools," as they are "improvements" to real property under the commonly understood definition of the term. *See Improvement, Black's Law Dictionary* (11th ed. 2019) ("An

- 19 -

addition to property, usu. real estate, whether *permanent or not*" (emphasis added)).[5]

Indeed, Plaintiffs' counsel acknowledged at oral argument that these portable classrooms could be considered "capital improvements" for impact fee expenditure purposes. We therefore hold the County properly included this expense in calculating its impact fees.

### b. *Support and Transportation Facilities*

Support and transportation facilities are certainly capital improvements; the question becomes whether they are "capital improvements to . . . schools," specifically. In their brief, Plaintiffs asserted that the word "school," for purposes of the Enabling Act, strictly and unambiguously means "a place where instruction is given: a building or group of buildings in which a school is conducted." *School*, *Webster's Third New International Dictionary* (3rd ed. 2002). Though a reasonable definition, Plaintiffs' counsel candidly conceded at oral argument that the question of what constitutes "capital improvements to . . . schools" is "a bit unclear." Rightly so; the limited definition offered by Plaintiffs is far from the only common one, with other ordinary definitions using more expansive terms to include all buildings used by an educational institution. *See, e.g., School*, *The American Heritage Dictionary of the English Language* (4th ed. 2001) ("The building or group of buildings housing an

_____

[5] Though termed "portable classrooms," the law requires them to "be anchored in a manner required to assure their structural safety in severe weather[,]" N.C. Gen. Stat. § 115C-521(b) (2021), revealing them to be less "portable" than their name suggests.

educational institution"); *School*, *Webster's New World Dictionary and Thesaurus* (4th ed. 2010) ("a place or institution, with its buildings, etc., for teaching and learning"); *School*, *Oxford Dictionary of English* (1st ed. 2010) ("the buildings used by a school"). Though legislative bodies have sometimes sought to clarify what buildings and improvements constitute part of a "school" by using alternative, expressly defined language, no such effort was made regarding the Enabling Act. *See generally Appalachian Materials, LLC v. Watauga Cnty.*, 262 N.C. App. 156, 822 S.E.2d 57 (2018) (holding there was no ambiguity in the term "educational facility," which was defined by ordinance to include only "elementary schools, secondary schools, community colleges, colleges, and universities" as well as "any property owned by schools for instructional purposes").

Whether something is part of a "school" is itself a fact-specific inquiry, and the common understanding of the word will often conflict with Plaintiffs' preferred definition. For example, a cafeteria, administrative building, parking lot, or playground are not in-and-of themselves "place[s] where instruction is given" or "buildings in which a school is conducted," *School*, *Webster's Third New International Dictionary* (3rd ed. 2002), but construct them on an elementary school campus and they are invariably considered part of the "school."[6] We therefore reason that the

---

[6] This is by no means an exhaustive list of examples, and the same may be said of countless other improvements like gymnasiums, athletic fields, sprinkler buildings, *etc. See, e.g.,* N.C. Gen. Stat. § 159D-37 (6a)a. (2021) (identifying, *inter alia*, libraries, laboratories, dormitories, dining halls,

word "school," as used in the Enabling Act, is broad and ambiguous, and could plausibly be read as either a limited reference to the buildings in which instruction occurs or a more expansive mention of all buildings and improvements used by a scholastic institution. *See, e.g., Visible Props., LLC v. Vill. of Clemmons*, 284 N.C. App. 743, 754, 876 S.E.2d 804, 812 (2022) ("When there are two or more reasonable interpretations of the law, the law is ambiguous." (citation omitted)).[7] Because we are required to construe any ambiguity in the Enabling Act broadly, N.C. Gen. Stat. § 153A-4 (2021), we hold that "capital improvements to . . . schools" includes the support and transportation facilities considered in the County's establishment of its impact fees.

### c. Buses and Consultant Fees

Unlike the aforementioned expenses, buses and TischlerBise's consultant fees are not "capital improvements to . . . schools" because they are not themselves "capital improvements" as the word is ordinarily understood. A bus and a consultant's report simply are not "acqui[sitions] [of] or improve[ments] [to] a fixed asset." *Capital Expenditure, Black's Law Dictionary* (11th ed. 2019). Nor are they "addition[s] to

---

athletic facilities, laundry facilities, "and other structures or facilities related to these facilities or required or useful for the instruction of students, the conducting of research, or the operation of the institution" as "educational facilities").

[7] In addition to arguing the merits of their claims, Plaintiffs assert they are owed attorney's fees on the basis that the County violated an unambiguous statute. *See* N.C. Gen. Stat. § 6-21.7 (2021) (providing that attorney's fees must be awarded if a county is found to have "violated a statute or case law setting forth unambiguous limits on its authority"). Our holding that the Enabling Act is ambiguous precludes such an automatic award of attorney's fees, though they may still be awarded in the sound discretion of the trial court. *Id.*

property[.]" *Improvement*, *Black's Law Dictionary* (11th ed. 2019).

The County's arguments to the contrary are unpersuasive. Though the County asserted in its brief and oral argument that TischlerBise's consultant fees relate to the "design" of future capital improvements, the reports in no way purport to "design" any capital improvements. The 2007 Studies do not, for example, include any architectural designs, traffic or environmental impact studies, or other necessary reports developed as part of a capital improvement project. As for buses, the County maintains that any expenses incurred from the operation or functioning of a school are "costs to the County of constructing certain capital improvements" recoupable under the Enabling Act. Enabling Act § (b)(1). But such a position is untenable; the County could not identify any school-related costs that fell outside this definition at oral argument, and this reading could logically reach everything from pencils to teacher salaries to cleaning supplies. In short, the County's reading would render the specific phrase "capital improvements" meaningless, and "a statute must be considered as a whole and construed, if possible, so that none of its provisions shall be rendered useless or redundant." *Porsh Builders, Inc. v. City of Winston-Salem*, 302 N.C. 550, 556, 276 S.E.2d 443, 447 (1981). Because the evidence shows the County may have included improper costs in calculating its impact fees, the trial court erred in granting summary judgment for the County on this claim.

### d. *Remand Is Required*

Though we hold that the County could not include buses and TischlerBise's

consultant fees in calculating school impact fees, this does not fully resolve Plaintiffs'

claims on behalf of the Feepayer Class. As noted in its brief, the County never set its

impact fees at 100% of the maximum amounts calculated by TischlerBise, electing

instead to impose fees ranging between 32% and 60% of that maximum amount at

various times. The County thus may have calculated and assessed impact fees that

did not incorporate or cover anticipated bus and consultant costs, as a review of the

2007 Studies shows that buses and consultant fees accounted for 4-6% of the

maximum total impact fees calculated for the OCSD and 1-2% for the CHCSD.

Further, the legislative findings in the County's ordinances reference the assessment

of impact fees only to cover "new school *facilities*," ORANGE COUNTY, N.C., CODE OF

ORDINANCES §§ 30-31.(2)-(4) (2008) (emphasis added), an undefined term whose

ordinary meaning unambiguously does not include buses or consultant fees. That

ordinance also explicitly states what the school impact fees may be spent on without

express mention of buses or consultant studies:

> Funds shall be used for capital costs associated with the
> construction of new public school space, including new
> buildings or additions to existing buildings or otherwise
> converting existing buildings into new public school space
> where the expansion is related to new residential growth.
> Such capital costs include actual building construction;
> design, engineering, and/or legal fees; land acquisition and
> site development; equipment and furnishings;
> infrastructure improvements; and/or debt service
> payments and payments under leases through which to
> finance such costs.

*Id.* § 30-35(c)(1). Because the issue of what damages are owed to Plaintiffs is

unsettled on the record, we remand the Feepayer claim for further proceedings to resolve this factual question.

Plaintiffs maintain that remand is not required because N.C. Gen. Stat. § 160D-106 requires the return of an illegally assessed fee *in toto* and does not provide for partial refunds. Even setting aside the unresolved factual question of whether improper costs were actually included in the County's final setting and expenditure of its school impact fees, we decline to adopt Plaintiffs' position because doing so would countenance an absurd result.

The statute at issue is designed to make plaintiffs whole for *illegal* fees only; nothing in the statute suggests it is intended to punish local governments while granting a windfall to plaintiffs. Section 160D-106 does not, for example, allow for punitive or treble damages. *Compare* N.C. Gen. Stat. § 160D-106, *with* N.C. Gen. Stat. § 75-16 (2021) (establishing treble damages for unfair and deceptive trade practice claims), *and* N.C. Gen. Stat. § 1D-15 (2021) (allowing for punitive damages in civil actions when certain aggravating factors are shown); *see also Houpe v. City of Statesville*, 128 N.C. App. 334, 351, 497 S.E.2d 82, 93 (1998) (holding a defendant could not pursue damages against a municipal government under punitive statute prohibiting blacklisting of employees because "punitive damages may not be recovered against a municipality absent statutory authorization, which [the blacklisting statute] fails to provide" (citations omitted)). Though it does allow for the recovery of interest, it does so at *less* than the legal rate imposed on ordinary

compensatory civil judgments. *Compare* N.C. Gen. Stat. § 160D-106 (authorizing refunds at 6% interest), *with* N.C. Gen. Stat. §§ 24-1 & -5 (2021) (collectively establishing the legal interest rate for civil judgments at 8% unless varied by contract). The intent of the statute to make feepayers whole without enriching them is further reinforced by its title, "*Refund* of *Illegal* Fees." N.C. Gen. Stat. § 160D-106 (emphasis added); *see also Brown v. Brown*, 353 N.C. 220, 224, 539 S.E.2d 621, 623 (2000) ("Although the title of an act cannot control when the text is clear, the title is an indication of legislative intent." (citation omitted)); *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 8, 727 S.E.2d 675, 681 (2012) ("[E]ven when the language of a statute is plain, the title of an act should be considered in ascertaining the intent of the legislature." (citation and quotation marks omitted)). That the statute contemplates "refunds" specifically undercuts any intent to award profits above and beyond the "illegal" amount paid. *See Refund, Oxford Dictionary of English* (1st ed. 2010) ("a *repayment* of a sum of money" (emphasis added)). And it does not otherwise appear that the statute was intended to encourage greater caution on the part of the County in assessing impact fees, particularly when: (1) the General Assembly elsewhere provided "local acts shall be broadly construed and grants of power shall be construed to include any powers that are reasonably expedient to the exercise of power," N.C. Gen. Stat. § 153A-4; and (2) the Enabling Act instructs the County to "*endeavor to approach* the objective of having every development contribute to a capital improvements fund," Enabling Act § (c) (emphasis added).

Said differently, allowing the Feepayers to profit (and not simply be made whole) by recovering the lawfully assessed portions alongside the much smaller unlawful portions would run contrary to N.C. Gen. Stat. § 160D-106's plain intent, as it would enrich the Feepayers and punish the County. We are required in such circumstances to deviate from the statute's plain language to avoid an absurd result that contravenes the legislature's manifest intent, particularly when the County was: (1) entitled to broad construction of any ambiguities, N.C. Gen. Stat. § 153A-4; and (2) given a broad mandate "to endeavor to approach" a fair assessment of fees, Enabling Act § (c). *See State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) ("[W]here a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, . . . the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." (citations and quotation marks omitted)).

In sum, we hold that the trial court erred in granting summary judgment for the County against the Feepayer Class claims to the extent that the County acted outside its authority under the Enabling Act by including buses and TischlerBise's consultant fees in the calculation and assessment of school impact fees. Because there remains a genuine issue of material fact as to the damages, if any, owed to the Feepayer Class under this theory, we remand the matter to the trial court for further proceedings not inconsistent with this opinion.

**C. Refund Class Claims**

The 2016 Ordinance provides that no refunds are to be paid if impact fees are "reduced due to an updated school impact fee study that results in changes to impact fee levels charged." 2016 Ordinance, § 30-35(e)(2). Conversely, refunds are owed if the impact fees are "reduced due to reasons other than an updated school impact fee study." *Id.* Plaintiffs rely on these provisions to press two distinct arguments on behalf of the Refund Class: (1) the 2016 Studies were not "updated school impact fee stu[dies]" because they were not strictly up-to-date; and (2) even if the 2016 Studies were a cause of the reduction, they were not the sole cause of the rate changes, and refunds are therefore owed because the fees were reduced for additional "reasons other than an updated school impact fee study." *Id.* We disagree with both contentions.

### 1. The 2016 Studies Were Updated

Plaintiffs first argument is premised on the assertion that "updated" means "to bring up to date" and "including the latest facts." *Update* & *Up-to-date*, *Webster's Third New International Dictionary* (3rd ed. 2002). As a semantic matter, the common meaning of the word "updated" does not invariably refer to something that is absolutely current. *See, e.g., Updated*, *Oxford Dictionary of English* (1st ed. 2010) (defining the adjective "updated" as something "made *more* modern *or* up to date" (emphasis added)). The 2016 Studies, which included new data over the 2007 Studies, were thus "updated" under the common meaning of the word.

As a factual matter, the 2016 Studies meet even Plaintiffs' preferred definition.

They were published in August and September 2016 and were based on the "current average student generation rates," the "actual current" level of service data, and the school inventory data available at the time the reports were drafted. The County then set its new impact fee rates on 15 November 2016. Yet Plaintiffs fault the Studies only for failing to include data released and certified *on or after 18 November 2016*, weeks after the Studies were published and days after the new impact fees were adopted. While the modified impact fee rates did not go into effect until January 2017, this does not negate the fact that the 2016 Studies were "updated" and "up-to-date" at the time the County actually enacted the reduction in fees.

## 2. *The Impact Fees Were Reduced Due to the Updated 2016 Studies*

Plaintiffs' second argument on behalf of the Refund Class is likewise misplaced. The 2016 Studies were the only precipitants identified in the prefatory text of the 2016 Ordinance changing the impact fee schedule:

> WHEREAS, *to ensure impact fees remain proportional to actual impacts caused, the County initiated a technical study in 2015 to study the school impact fees* and determine the "maximum supportable impact fee" that could be charged for various new housing types, and
>
> WHEREAS, said *technical study was completed in August 2016*, and
>
> WHEREAS, the County has held the required public hearing on the proposed amendments to Chapter 30, Article II of the Code of Ordinances *and the impact fee studies*.
>
> BE IT ORDAINED by the Board of Commissioners of

> Orange County that Chapter 30, Article II—Education
> Facilities Impact Fee is hereby amended as depicted in the
> attached pages.

Orange County, N.C., Ordinance ORD-2016-034 (Nov. 28, 2016) (emphasis added).

Though Plaintiffs seek to impeach this legislative record based on the County's discovery responses and statements by the County's planning director, the county attorney, and individual commissioners suggesting that additional policy considerations were at play, our caselaw provides that generally, for purposes of statutory interpretation, the intentions of the legislating body are to be derived from the text of the enactment itself rather than statements of individuals. *N.C. Milk Comm'n v. Nat'l Food Stores, Inc.*, 270 N.C. 323, 332-33, 154 S.E.2d 548, 555-56 (1967). *See also State v. Evans*, 145 N.C. App. 324, 329, 550 S.E.2d 853, 857 (2001) (holding that Governor James B. Hunt, Jr.'s press release stating an intention to "crack down on drunk drivers and let them know they'll pay the price" by tripling the civil driver's license revocation period was not competent evidence to show that the increased revocation period was intended to be punitive, and thus criminal, in nature). Indeed, the record reveals that these policy concerns, to the extent that they were considered by the County and its Board of Commissioners, were all resolved *in light of and in reliance on* the new data and analysis provided by the updated 2016 Studies. The record reflects that the updated 2016 Studies were both the precipitating and indispensable cause of the County's reduction in school impact fees, and the changes were not made "*due to reasons other than* an updated school impact

fee study." 2016 Ordinance § 30-35(e)(2) (emphasis added).[8]

Even if Plaintiffs are correct that the County considered other policy implications in adjusting the impact fees, we decline to adopt Plaintiffs' reading of the 2016 Ordinance's refund provision; namely, that refunds are owed if impact fees are reduced for reasons in addition to an updated study. Such a reading would render ineffective the first clause of the refund provision that no refunds are owed "[i]f the Schedule of Public School Impact Fees . . . is reduced due to an updated school impact fee study that results in changes to impact fee levels charged." *Id.* When asked at oral argument for an example of when refunds would be owed under the 2016 Ordinance, counsel for Plaintiffs asserted that a TischlerBise study showing that impact fees were being assessed over the maximum amount allowed by law would "forc[e] the County to reduce its fees." But this is not quite right; TischlerBise, a private consulting firm, cannot "force" the Board of County Commissioners, as an independent legislative body, to take any action whatsoever. Only the limits placed on the County by law can do that. *See, e.g., Rowe v. Franklin Cnty.*, 318 N.C. 344, 348-49, 349 S.E.2d 65, 68-69 (1986) (holding that a county's act "is *ultra vires* if it is

---

[8] The dissent asserts that reference to the 2016 Ordinance's prefatory language for the Commission's legislative intent renders application of the provision allowing for refunds "futile." But this is not inexorably true; if an ordinance reducing impact fees included a prefatory "whereas" clause explicitly *disclaiming* reliance on any updated impact fee studies, then the 2016 Ordinance's provisions would plainly require refunds. So, too, would refunds be required if the impact fees were reduced and no updated studies had been done at all. In actuality, and as explained *infra*, it is the reading of the refund provision advocated by the Plaintiffs and adopted by the dissent that impermissibly renders a portion of the 2016 Ordinance a nullity.

beyond the purposes or powers expressly or impliedly conferred . . . by its . . . charter and relevant statutes and ordinances"). Rather, the County would only reduce the fees in this scenario for additional or other reasons: for example, the County Commissioners may have reduced the fees for the additional reason that they agreed with TischlerBise's analysis and methodology showing that *the law* compelled a reduction, or they may have disagreed with the study but nonetheless determined that a reduction was proper on other policy grounds.[9] Either way, refunds would be owed even under Plaintiffs' own hypothetical attempt at triggering the non-refund provisions of the 2016 Ordinance, and we will avoid a reading that renders any portion thereof "useless or redundant." *Porsh Builders, Inc.*, 302 N.C. at 556, 276 S.E.2d at 447.

Based on the above, we hold that the trial court properly granted summary judgment for the County on the Refund Class's claims. The 2016 Studies were "updated," and the impact fee reduction was "due to [those] updated school impact fee stud[ies]" within the meaning of the 2016 Ordinance. 2016 Ordinance § 30-35(e)(2). We therefore affirm the trial court's summary judgment order on this ground.

---

[9] Plaintiffs' counsel impliedly recognized these points at oral argument, stating on the one hand that, "if the study results indicated that the County had to [reduce fees] *to stay in compliance with the statute and the constitutional requirements for impact fees,* then that would be the study causing them to go down," while recognizing on the other that "the County . . . could have completely disregarded the TischlerBise studies." (Emphasis added).

**D. Plaintiffs' Motion to Strike**

Finally, Plaintiffs assert that the trial court erred in denying their motion to strike the County's amended motion for summary judgment. The amended motion did not substantively alter the original motion, while the affidavits attached to the amended motion were timely filed in opposition to Plaintiffs' motion for summary judgment. *See* N.C. R. Civ. P. 56(c) (2021) ("The adverse party may serve opposing affidavits at least two days before the hearing."). Because the portions properly subject to the motion to strike are not substantive and have no bearing on the resolution of this appeal, whether the trial court abused its discretion is moot. *See Roberts v. Madison Cnty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398-99, 474 S.E.2d 783, 787 (1996) ("A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." (citation omitted)). We therefore decline to address this portion of Plaintiffs' appeal.

### III.  CONCLUSION

Plaintiffs, on behalf of the Feepayer Class, have demonstrated that there are genuine issues of material fact concerning the damages owed due to the assessment of impact fees to cover costs that do not fit within the Enabling Act's definition of "capital improvements to . . . schools,"—specifically the assessments for buses and the TischlerBise study—and the County has not shown that this claim is precluded as a matter of law. We therefore reverse the summary judgment order in part and remand for further proceedings on this claim. However, we hold that the Plaintiffs

have failed to show any such genuine issue of material fact as to the Refund Class, and the trial court properly granted summary judgment for the County on these claims.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Judge GORE concurs.

Judge STADING dissents by separate opinion.

No. COA22-691 – *Zander v. Orange Cnty.*

STADING, Judge, dissenting.

I respectfully dissent from the majority's decision to affirm the trial court's order granting summary judgment for Orange County. In this matter, we consider whether Orange County exceeded the bounds of its delegated authority under 1987 N.C. Sess. Laws 616, ch. 460 § 17 ("the Session Law"), and subsequent amendments, through its calculation and exaction of impact fees before issuing a certificate of occupancy for any new residential housing unit. To collect the impact fees authorized under the Session Law, the Orange County Board of Commissioners adopted the "Educational Facilities Impact Fee Ordinance." ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, §§ 30-31 – 30-80 (1993) ("the Ordinance"). The Ordinance mandated that no "occupancy permit shall be issued for any new residential dwelling unit until the public school impact fees hereby required have been paid in full." *Id.* The Ordinance was later amended with updated impact fee schedules and a provision for reimbursement of fees if they were "reduced due to reasons other than an updated school impact fee study." ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, §§ 30-31 – 30-80 (2016).

The Session Law was intended to "help defray the costs to the County of constructing certain capital improvements, the need for which is created in part by the new development that takes place within the County." 1987 N.C. Sess. Laws 616,

ch. 460, § 17(b). To lawfully fulfill this objective, the legislature provided mandatory steps for the County to determine the cost of capital improvements and a formula for calculating impact fees. 1987 N.C. Sess. Laws 616, ch. 460, § 17(c). The North Carolina Constitution requires the General Assembly to "provide for the organization . . . of counties, cities and towns, and other governmental subdivisions" and authorizes it to "give such powers . . . as it may deem advisable." N.C. CONST. art. VII, § 1. "From the very formation of our State government, municipalities, in their various forms, have been considered creatures of the legislative will, and are subject to its control." *Quality Built Homes, Inc. v. Town of Carthage*, 369 N.C. 15, 18, 789 S.E.2d 454, 457 (2016) (citations omitted). Logically, "[a]ll acts beyond the scope of the powers granted to a municipality are void." *City of Asheville v. Herbert*, 190 N.C. 732, 735, 130 S.E. 861, 863 (1925) (citations omitted).

Substantial evidence shows that when Orange County calculated the taxes at issue, it neglected to follow the protocol outlined and mandated by the General Assembly in the Session Law. While I agree with the majority that impact fees should not have been expended on buses and consultant studies, I am nevertheless precluded from reaching consideration of impermissible costs because a jury should resolve the lawfulness of the impact fees as a preliminary matter. Similarly, there is a genuine issue of material fact to be resolved with respect to the contradictory evidence of underlying reasons for a reduction in impact fees.

## I.     The Session Law and the County Ordinance

## A. **The Session Law**

To accommodate the demands of rapidly growing Orange County, the General Assembly passed the Session Law to authorize additional taxation within Orange County's planning jurisdiction. Section 17 read as follows: "Orange County may provide by ordinance for a system of impact fees to be paid by developers to help defray the costs to the County of constructing certain capital improvements, the need for which is created in substantial part by the new development that takes place within the County." 1987 N.C. Sess. Laws 616, ch. 460, § 17(b). The Session Law defined capital improvements to include: "the acquisition of land for open space and greenways, capital improvements to public streets, schools, bridges, sidewalks, bikeways, on and off street surface water drainage ditches, pipes, culverts, other drainage facilities, water and sewer facilities and public recreation facilities." *Id.*

The law provided for a mandatory, deliberate scheme that the County was required to follow to ensure that each development contributed to a capital improvement fund, a sum bearing a reasonable relationship to that development's fair share of necessary costs. 1987 N.C. Sess. Laws 616, ch. 460, § 17(c). The Session Law's language outlined a three-step process:

> (1)  Estimate the total cost of improvements by category (e.g., streets, sidewalks drainage ways, etc.) that will be needed to provide in a reasonable manner for the public health, safety and welfare of persons residing within the County during a reasonable planning period not to exceed 20 years. The Board of County Commissioners may divide the County into two or

> more districts and estimate the costs of needed improvements within each district. These estimates shall be periodically reviewed and updated and the planning period used may be changed from time to time.
>
> (2)    Establish a percentage of the total costs of each category of improvement that, in keeping with the objective set forth above, should fairly be borne by those paying the impact fee.
>
> (3)    Establish a formula that fairly and objectively apportions the total costs that are to be borne by those paying impact fees among various types of developments. . . .

*Id.* In sum, the legislation charged the County with (1) estimating the total cost of reasonable improvements by category over a planning period of 20 years or less, (2) establishing a percentage of those costs fairly assumed by the fee payer, and (3) establishing a formula apportioning the costs among different types of developments. In 1991, the legislature expanded the applicability of the Session Law from the "planning jurisdiction of Orange County" to "everywhere in Orange County." 1991 N.C. Sess. Laws 607, ch. 324, § 1. The law was amended again in 1993 to specifically permit Orange County to use impact fees for financing and leasing obligations. 1993 N.C. Sess. Laws 313, ch. 642, § 4(a).

## B. **The County Ordinance**

In 1993, Orange County adopted an "Educational Facilities Impact Fee Ordinance" to provide for the system of impact fees. ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, §§ 30-31 – 30-80 (1993). Until its repeal

in 2017, the Ordinance was amended several times. ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, §§ 30-31 – 30-80 (2017) (previously amended 1993, 1995, 1996, 2001, 2008, 2009, 2011, 2013, 2016). In 1993, the Ordinance set impact fees at $750 per residential dwelling unit for both Orange County and Chapel Hill-Carrboro School Districts. ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-33 (1993). The impact fees changed over time as the Ordinance was amended. In 1995, the amended Ordinance set impact fees at $750 per residential dwelling unit in the Orange County School District and $1,500 per residential dwelling unit in the Chapel Hill-Carrboro School District. ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-33 (1995). Additional amendments instituted more complex annual increases with additional categories of dwelling unit type. In 2008, the Ordinance was amended to incorporate figures derived from a report produced by the County's hired consultant. This amendment implemented maximum supportable impact fees, as calculated in the report, at 32% in 2009, 40% in 2010, 50% in 2011, and 60% in 2012. In doing so, the County adopted its hired consultant's calculations and underlying assumptions.

Each version of the Ordinance contained a clause under the subheading "Limitation on Expenditure of Funds" that stated, "[f]ollowing their collection, funds shall be expended within ten (10) years, the time frame coinciding with the public school facilities capital improvements program (CIP) school impact fee period." ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, §§ 30-

35(c)(5) (2017) (previously amended 1993, 1995, 1996, 2001, 2008, 2009, 2011, 2013, 2016).  The Ordinance, as amended in 2016, contained a provision contemplating when reimbursement of fees shall be made:

> If the Schedule of Public School Impact Fees . . . is reduced due to an updated school impact fee study that results in changes to impact fee levels charged, no refund of previously paid fees shall be made.  If the Schedule of Public School Impact Fees . . . is reduced due to reasons other than an updated school impact fee study, the difference between the old and new fees shall be returned to the feepayer . . . with interest. . . .  If the Schedule of Public School Impact Fees . . . is increased, no additional fees shall be collected from new construction for which certificates of occupancy have been issued.

ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-35(e)(2) (2016).

## II.     Chronology of Actions by the County

### A.  Initial Calculation Method

A review of the record displays the County's course of action throughout the lifespan of the legislation.  In the 1990s, the County used a process contained within a "Technical Report" to calculate the proportionate share of impact fees for financing public school capital needs.  This report used a formula for "needed improvements" by multiplying "demand units" and "service standards."  "Demand units" were derived by employing census data (later updated with additional data collection) to arrive at the average number of school-age children per residential housing unit.  "Service standards" were determined by relevant square-footage standards and land

area needed per student by type of school. The report then specified a reasonable cost calculation for the above-determined "needed improvements" multiplied by "cost per unit." The overall method also accounted for proportionality by employing several "factors." These factors included credit for projected sales-tax contributions, grants from the State, and revenue from property tax collections over a ten-year period using a present-value estimation for future payments.

Consistent with the Session Law, the "Technical Report" appeared to implement a ten-year planning period. This report quoted the portion of the Session Law, directing Orange County to "estimate the total cost of improvements . . . that will be needed . . . during a reasonable planning period not to exceed 20 years." More importantly, the analysis specified that the ten-year timeframe is "the period of time within which the new school facilities listed [within the report] . . . will be needed." Moreover, the report listed that "both school districts have prepared ten-year school improvement planning programs which identify new public schools needed within the next 10 years to meet projected student enrollments."

Lastly, the "Technical Report" weighed the sufficiency of the benefits that are received by fee payers. The report noted the relevancy of temporal restriction on projected needs and established rational geographical districts that existed "in the form of the Chapel Hill-Carrboro School District and the Orange County School District." To address disparities in each district's population and cost of living, the report tabulated separate impact fees for each school district. This geographical

distinction sought to ensure that residents of one district would not pay impact fees higher than necessary, nor pay for facilities they would never use. In practice, this limitation was exemplified by the need for a single new elementary school in the Orange County School District; meanwhile, the Chapel Hill-Carrboro School District required two new elementary schools, a new middle school, and expansion of an existing high school. Accounting for such differences in the calculation pursued the objective of fairly and objectively apportioning the costs.

### B. Subsequent Calculation Method

In 2001, the County engaged Tischler & Associates, Inc., a consulting firm, to produce a report on "School Impact Fees" for both school districts. In that report, "[t]he basic formula used to derive the impact fee for both school districts is to multiply student generation rates by the net capital costs of public schools per student." A chart included in the report indicated that "student generation rates" were "public school students per housing unit" in the 2000–01 school year.

"Capital costs," reflected in a chart contained in the report, were comprised of average land costs based on past purchases, building costs derived from averages of "anticipated total project costs for five new schools," portable classroom costs determined by then-current prices, an enigmatic formula that estimated replacement costs of administrative facilities, and finally, cumulative transportation costs reliant upon 2001 figures. A credit was factored in for "future principal payments on existing General Obligation bonds." The consulting firm recommended implementation of this

methodology based on its experience that, "jurisdictions usually conclude that it is better to adopt impact fees based on current standards rather than desired levels of service" since the "latter approach creates existing deficiencies that must be corrected in a reasonable time from non-impact fee funding."

In 2007, the consultant, now TischlerBise, Inc. ("TischlerBise"), created a separate "School Impact Fees" report for each school district. These reports employed the "incremental expansion fee calculation" method to calculate the maximum supportable school impact fees for each district. According to TishclerBise, this method was "best suited for public facilities that will be expanded in regular increments, with [level of service] standards based on current conditions in the community." Also, this method used revenue "to expand or provide additional facilities, as needed, to accommodate new development."

TischlerBise's reports depicted the impact fee formula as the student per housing unit by type of unit (student generation rate), multiplied by the net local capital cost per student. The equation is visually represented as: Impact Fees = Student Generation Rate x Net Capital Cost per Student. The student generation rate stemmed from the system's average number of public school students per housing unit. The costs were "based on current levels of service . . . and project costs for each type of school facility (i.e., elementary, middle, and high), land for school sites, support facilities, portable classrooms, and buses." Finally, a credit was

assessed for future revenue credits such as property taxes, and site-specific credits such as system improvements.

An in-depth look at the student generation rates by type of housing unit reveals that TishlerBise used an adjusted rate based on current enrollment from the 2006–07 school year. A detailed review of the formula to determine net capital cost per student shows that it consisted of several factors. First, construction costs were calculated using planned project costs in present dollars and previous project costs converted to "present-day costs" by using the "Marshall Valuation Service Comparative Cost Multipliers." These costs were expressed per square foot and multiplied by the square feet per student. The number of square feet per student was approximated by taking the existing facility square footage and dividing it by the current enrollment at each level. Second, a similar level of service calculation for land was employed by determining acre per student. An approximation of land value per acre of suitable sites was provided for each district "[p]er the Orange County Tax Assessor's office." As for portable classrooms, the consultant again applied its level of service formula to estimate costs. Next, to determine the costs of support facilities, the existing building costs were divided by the current enrollment in each district. The costs of a shared transportation facility were assessed to both school districts. Vehicle costs were decided based on existing levels of service per district enrollment for the 2006–07 school year. Also included in TischlerBise's tabulation was a "consultant study cost per student," that required the feepayer to pay for the study

(which assessed the fees to the feepayer). Finally, the calculation considered credits for present value on future principal payments of property taxes, paying down school bond debt per projected student enrollment.

After the total net local capital costs per student were determined by adding the above-listed categories, each district's maximum supportable impact fees were calculated by multiplying those costs by the student generation rate per level of school and housing unit type. These figures were expressed in a chart as fees at each level of school (elementary, middle, or high school) per housing unit type (single-family detached, single-family attached, multifamily, or manufactured home). Next, these numbers were summed to determine the maximum supportable impact fee per housing unit type. The report then recommended a "full update . . . every 3 to 5 years to reflect changes in development trends, infrastructure capacities, costs, funding formulas, etc." In contrast to the references contained in the 1990s report, the 2007 report did not mention the use of a planning period within the parameters set by the Session Law.

In 2016, Orange County again retained TischlerBise to complete another report to assess impact fees in each district. Like the earlier report, this report cited the "three basic methods for calculating impact fees" and favored the incremental expansion method. Unlike the prior report, student generation rates were further divided into more specific categories. There was no ascertainable use or articulation of a specific planning period to arrive at the rates. Costs were adjusted upwards in

some cases (construction, portable classrooms in one district, support facilities, transportation in one district, consultant study), remained constant in others (portable classrooms in one district), or removed altogether (land, transportation in one district). Overall, in the Orange County School District, maximum impact fees were calculated much higher in each category of housing unit, with exceptions for the new categories of single-family detached of less than 800 square feet and age-restricted units. The Chapel Hill-Carrboro City School District assessments for maximum impact fees were higher for single-family attached and multifamily, and slightly lower for single-family detached and manufactured units.

### III. Analysis

### A. Standard of Review

This case presents cross-motions for summary judgment. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2023). "[A]ll inferences of fact . . . must be drawn against the movant and in favor of the party opposing the motion." *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975) (citations omitted). In other words, "[t]he court must view the evidence presented by both parties in the light most favorable to the nonmoving party." *Wilmington Star-News v. New Hanover Reg'l Medical Ctr.*, 125 N.C. App. 174, 178, 480 S.E.2d 53, 55 (1997) (citation omitted). The

standard of review for summary judgment is *de novo.* *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007) (citation omitted).

### B. <u>Fee Payer Class</u>

"Counties are instrumentalities and agencies of the State government and are subject to its legislative control; they possess only such powers and delegated authority as the General Assembly may deem fit to confer upon them." *High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 654, 142 S.E.2d 697, 701 (1965) (citations omitted). "They are authorized to exercise only those powers expressly conferred upon them by statute and those which are necessarily implied by law from those expressly given." *Davidson Cnty. v. High Point,* 321 N.C. 252, 257, 362 S.E.2d 553, 557 (1987) (citations omitted). "Powers which are necessarily implied from those expressly granted are only those which are indispensable in attaining the objective sought by the grant of express power." *Id.* (citation omitted). Additionally, any such "statutorily granted powers" conferred upon a political subdivision "are to be strictly construed." *Id.* (citation omitted).

Here, in exercising its authority to tax, delegated by the Session Law, the County was required to "[e]stimate the total cost of improvements by category . . . that will be needed to provide in a reasonable manner . . . during *a reasonable planning period* not to exceed 20 years." 1987 N.C. Sess. Laws 616, ch. 460, § 17(c) (emphasis added). Since "the statutory language is clear and unambiguous, we must give effect to the plain and definite meaning of the language." *Carolina Power &*

*Light Co. v. City of Asheville*, 358 N.C. 512, 518, 597 S.E.2d 717, 722 (2004) (citation omitted). In order to determine whether the County complied with the unambiguous language of the Session Law, an analysis of the formula used by its hired consultant is necessary.

The formula used by TischlerBise to calculate the fees imposed on residential developments begins by determining the "student generation rate" (number of public school students per housing unit). This portion of the calculation considers estimated demand levels that would be relevant for determining, what if any, planning period was employed. As a starting point, the County provided "2005 student generation rates" to TischlerBise. The consultant multiplied the provided rates by "estimated housing units" (from a base year of 2006—07) to surmise the number of "estimated students." Then, the "adjusted student generation rates" used in TischlerBise's impact fee calculation were derived by dividing actual student population (from 2006—07 school year enrollment data) by "estimated students," and then multiplying this result by the County's 2005 student generation rate. After carefully reviewing TischlerBise's calculation, there is evidence that a planning period was not incorporated into the formula that ultimately determined impact fees. The language of the Session Law requires "a reasonable planning period not to exceed 20 years." 1987 N.C. Sess. Laws 616, ch. 460, § 17(c). Therefore, an application of the plain meaning rule to the Session Law's language and employment of the principle of strict construction would preclude this Court from concluding that the trial court properly

14

granted summary judgment for the County.

The majority's holding that the County complied with the Session Law's planning period requirement is overly reliant on language in the Ordinance that "funds . . . shall be expended within (10) ten years, the timeframe coinciding with the public school facilities capital improvements program (CIP) school impact fee period." ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-35(c)(5) (2008). However, these words mean nothing if the County's course of action pursuant thereto failed to follow its own requirements. Here, the paramount consideration is a thorough review of the calculations used in TischlerBise's reports that determined maximum supportable impact fees which were adopted by the County. Therefore, merely placing a window dressing of statutorily-compliant language in the Ordinance—the requisite planning period in this case—has no bearing if such planning period was not genuinely employed in the calculations implemented by the County upon taxing the citizenry.

Alternatively, the majority maintains that "even if the County did not employ the ordinance's 10-year planning period and otherwise relied exclusively on . . . TischlerBise's 2007 Reports . . . the Reports themselves estimated the total anticipated capital improvement costs to schools for a five-year period, stating OCSD's 'school local capital costs average approximately $6 million per year, or *$30.4 million over five years*,' and the CHCSD's 'school local capital costs average approximately $11.3 million per year, or *$56.7 million over five years*.'" To the

15

contrary, this "Cash Flow Projections" section of TischlerBise's 2007 reports is not a planning period, but a projection provided to the County showing that the "maximum supportable level" of impact fees (determined by their method of calculation) would cover 85% of capital costs over a period of five years. A summary of projected cash flow is not an ascertainable planning period used in the math of TischlerBise's 2007 reports.

The majority also discounts the impact of any flaws in the consultant's work by relying on "the fact that the County Board of Commissioners is not TischlerBise." This logic would withstand scrutiny if the County had independently used a system to tax its citizens that articulated needs by category ("estimate the total cost of improvements by category. . . that will be needed"), appropriately tailored within the confines of the Session Law ("in a reasonable manner for the public health, safety and welfare"), and within a specific period of time to accurately calculate demand ("during a reasonable planning period not to exceed 20 years"). 1987 N.C. Sess. Laws 616, ch. 460, § 17(c). Nonetheless, the record is clear that the County applied percentages to the exact same numbers contained in their consultant's reports. In sum, the County's taxation scheme directly implemented the calculations (and any underlying assumptions) used by TischlerBise. Accordingly, if TischlerBise failed to use "a planning period" as mandated by the Session Law, the County also failed to do so.

Further, the majority maintains that "even if the County did not employ the ordinance's 10-year planning period and otherwise relied on TischlerBise's 2007

16

Reports," this action was compliant with the Session Law because "the County's discovery responses explicitly identified this five-year estimate [from the 'Cash Flow Projections' section of TischlerBise's 2007 reports] as a planning period." Even if strict construction of the Session Law somehow permits us to accept alternate or multiple planning periods, we face contradictory evidence in the record from a County 30(b)(6) witness—the Director of Planning and Inspections Department for Orange County. This witness stated that the planning period was not ten years, and "it depends" as to whether it was less than ten years. When asked if the planning period was less than nine years, his response was, "you look back seven years." After the inability to provide a planning period, the County witness offered, "[w]hat I do know is that it was a reasonable period of time to assess the impacts for public health, safety, and welfare of persons in the county." The majority maintains that this evidence "shows that the witness was testifying to his lack of definite knowledge concerning TischlerBise's utilized planning period rather than completely disclaiming any use of: (1) a planning period by TischlerBise; or (2) a 10-year planning period. . . ." While the majority provides an explanation to the witness's answer, the other explanation—that he does not know because a planning period was not used—is equally plausible and ripe for the deliberation of a jury. On its face, the evidence of compliance with the Session Law is contradictory and leaves fact-finding to be done by the factfinder.

The majority opinion also rests on the assertion that "whether the County used

17

a five-year or a 10-year planning period[,] . . . that fact is not *material* to the Feepayer's claims because, whichever way that issue is resolved, it cannot establish non-compliance with the Enabling Act." However, the Session Law plainly required the County to "estimate the total cost of improvements by category . . . during *a reasonable planning period* not to exceed 20 years . . . and *the planning period* used may be changed from time to time." 1987 N.C. Sess. Laws 616, ch. 460, § 17(c) (emphasis added). To limit the planning period at or under twenty years, it must be identifiable. And to change the planning period from time to time, it must be ascertainable. Therefore, suggesting that the planning period can be X (an unknown number), and that we can just assume that X is equal to or less than twenty years, does not permit the County to carry out the intent of the words of the Session Law. Also, a plain and definite meaning of "a planning period" and "the planning period" can only mean a singular planning period. Assuming *arguendo,* if the Session Law somehow permitted the County to use planning periods of both X and Y (both equal to or less than twenty years), there is evidence that TischlerBise's reports did not even employ such calculation. The use of "a reasonable planning period not to exceed twenty years," is material to the litigation. Here, the statute must be strictly construed and, unlike horseshoes and hand grenades, strict compliance with its provisions is required.

Moreover, logic requires that a planning period must be identified for use in the mathematical formula estimating the anticipated needs sought to be addressed

18

by the Session Law and the taxes authorized thereunder. In other words, if the County does not properly calculate the demand side of the equation as required by the Session Law, it cannot determine the permitted levels of taxation. Accordingly, the failure to use "a planning period" is noncompliance with the Session Law and results in *ultra vires* fee collection. 1987 N.C. Sess. Laws 616, ch. 460, § 17(c). The inability of the County and the majority to articulate the planning period illustrates the point that the calculations used by TischlerBise, and adopted by the County, may not have employed a planning period. Likewise, the majority also claims that "the Feepayers and the dissent have not identified any evidence showing that the County did not utilize a . . . planning period of less than 20 years. . . ." However, this is to be expected since the evidence indicates there is an absence of a planning period in the math of the consultant. Evidence of noncompliance with the Session Law is a material fact, as "it would constitute or would irrevocably establish any material element of a claim. . . ." *Bone International, Inc. v. Brooks*, 304 N.C. 371, 375, 283 S.E.2d 518, 520 (1981) (citation omitted).

Here, summary judgment would be appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). Furthermore, "[w]hen considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party."

19

*Strickland v. Hedrick*, 194 N.C. App. 1, 9, 669 S.E.2d 61, 67 (2008) (citation omitted). "All inferences of fact must be drawn against the movant and in favor of the nonmovant." *Id.* (citation omitted). Contrary to the ruling of the trial court, the record before us shows there is genuine issue of material fact as to the claims against the Defendant. The record contains evidence that the incremental expansion method of calculation, employed by TischlerBise and adopted by the County, did not estimate the costs of improvements to be made "during a reasonable planning period not to exceed 20 years." 1987 N.C. Sess. Laws 616, ch. 460, § 17(c). Accordingly, regarding the County's compliance with the Session Law, there is an issue of fact to be resolved by a jury of the citizens who stand to assume the benefits and detriments of those fees.

## C. Refund Class

Unlike the rule of strict construction guiding our review of a county's legislatively granted powers, "[a] remedial statute must be construed broadly in the light of the evils sought to be eliminated, the remedies intended to be applied, and the objective to be attained." *O & M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 268, 624 S.E.2d 345, 348 (2006) (citation omitted). A "statute, being remedial, should be construed liberally, in a manner which assures fulfillment of the beneficial goals for which it is enacted and which brings within it all cases fairly falling within its intended scope." *Burgess v. Joseph Schlitz Brewing Co.*, 298 N.C. 520, 524, 259 S.E.2d 248, 251 (1979) (citations omitted). "The rules applicable to statutes apply equally to

the construction and interpretation of an ordinance adopted by the 'legislative body' of a municipality." *In re O'Neal*, 243 N.C. 714, 720, 92 S.E.2d 189, 193 (1956) (citation omitted).

At issue, the Ordinance as amended in 2016, provides that when a reduction in impact fees is made "due to an updated school impact fee study . . . no refund of previously paid fees shall be made." ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-35(e) (2016) (repealed 2017). However, refunds shall be made if there is a reduction in fees "due to reasons other than an updated school impact fee study." *Id.* § 30-35(e)(2). Based on these provisions, plaintiffs posit two arguments: (1) that the 2016 TischlerBise impact fee studies were not "updated school impact fee stu[dies]" because they did not contain up-to-date data, and (2) the reduction in fees was "due to reasons other than an updated school impact fee study." Whereas the majority finds that both contentions lack merit, I would hold that the second issue creates a genuine issue of material fact, rendering the trial court's order of summary judgment inappropriate.

A review of the record shows that, on 11 December 2008, the Board of Commissioners of Orange County voted to implement annually increasing impact fees. Thereafter, in 2016, TischlerBise completed school impact fee reports for each school district. The maximum supportable impact fees calculated by TischlerBise were increased in each category of housing unit (excepting the new subcategory of single-family detached less than 800 square feet) from the last effective rates

assessed under the 2008 Ordinance. *Id.* § 30-35(e). Nonetheless, on 15 November 2016, the County adopted the calculations from the report and assessed a percentage to these maximum figures that "feels fair." As a result of the numbers provided and the percentage selected (43% percent of the maximum supportable impact fee), effective 1 January 2017, fees for some categories from each district were reduced from their previous levels. At the same meeting, the Board updated the subsection on "Reimbursement of fees" to read: "[i]f . . . reduced due to an updated school impact fee study . . . no refund of previously paid fees shall be made." However, "[i]f . . . reduced due to reasons other than an updated school impact fee study, the difference between the old and new fees shall be returned to the feepayer. . . ." *Id.*

The record provides several possibilities as the impetus for the reduction in school impact fees. On 19 October 2016, the County attorney sent an email cautioning the Board of Commissioners about the North Carolina Supreme Court's recent posture towards impact fees. The email further warned the Board of Commissioners of "another keep your head down aspect," perceiving that the status of the legislature with respect to the real estate lobby, made the timing of the proposed ordinance amendment "less than desirable." According to the County's planning director, this correspondence "would have been something that if they were to update their impact fees . . . they needed to keep these things in mind when they proceeded with making adjustments." The County's response to interrogatories provided another possible reason for the change in fee levels: "[a] breakeven point of 43% of the MSIF [maximum

supportable impact fees] was used to achieve the same revenues in the first year as compared to the 2008 Fee Schedule." Compared to the reports produced by TischlerBise in 2007, the 2016 reports supported nearly across-the-board increases in school impact fees for both school systems. Nonetheless, on 15 November 2016, the County adopted the calculations from the 2016 reports and assessed a percentage to these increased maximum numbers that "feels fair" and thereby lowered impact fees for most housing categories.

Despite the preceding possibilities, the majority points to the following prefatory text of the Ordinance as amended in 2016, in which the County identifies the 2016 study as the precipitant for changes in the fee rate:

> WHEREAS, *to ensure impact fees remain proportional to actual impacts caused, the County initiated a technical study in 2015 to study the school impact fees* and determine the "maximum supportable impact fee" that could be charged for various new housing types, and
>
> WHEREAS, said *technical study was completed in August 2016*, and
>
> WHEREAS, the County has held the required public hearing on the proposed amendments to Chapter 30, Article II of the Code of Ordinances *and the impact fee studies*.
>
> BE IT ORDAINED by the Board of Commissioners of Orange County that Chapter 30, Article II—Education Facilities Impact Fee is hereby amended as depicted in the attached pages.

ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-

35(e) (2016) (repealed 2017) (emphasis added). We should not accept the mention of the 2016 study in the prefatory language of the amended Ordinance as superior to and unchallenged by other contrary evidence that should be viewed "in a light most favorable to the nonmoving party." *Strickland*, 194 N.C. App. at 9, 669 S.E.2d at 67. While the prefatory language of the amended Ordinance suggests one possible precipitant, overreliance on this text turns a blind eye to other evidence in the record. Consider an ordinance, such as the remedial ordinance at issue, which requires a determination of causation. If the prefatory language always unquestionably governs in the face of evidence to the contrary, then the inclusion of the language of the amended Ordinance mandating that refunds shall be made if there is a reduction in fees "due to reasons other than an updated school impact fee study" was unnecessary and futile. ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-35(e)(2) (2016) (repealed 2017). Deference to the prefatory language to this end does not broadly construe the amended Ordinance "in the light of the evils sought to be eliminated, the remedies intended to be applied, and the objective to be attained." *O & M Indus.*, 360 N.C. at 268, 624 S.E.2d at 348 (citation omitted).

Next, the majority opinion seeks to square this circle by negating the discovery responses from the County and citing principles of statutory interpretation, in stating that "the intentions of the legislating body are to be derived from the text of the enactment rather than the statement of individuals." Such consideration might rule the day if our inquiry was one of pure statutory construction—seeking to derive the

legislature's intent from an ambiguous enactment. However, here, we seek to determine whether there is a genuine issue of material fact as to whether the County complied with the unambiguous language of the amended Ordinance. "Questions of statutory interpretation are questions of law, which are reviewed *de novo* by an appellate court." *Savage v. Zelent*, 243 N.C. App. 535, 538, 777 S.E.2d 801, 804 (2015). An application of this standard does not permit this Court to discount the discovery responses and statements by the County's planning director, the County's attorney, and individual commissioners. Dismissing the "reasons other than an updated school impact fee study" in the record as "policy concerns" does not negate their role in causation. ORANGE COUNTY, N.C., ORANGE COUNTY CODE OF ORDINANCES ch. 30, art. VI, § 30-35(e)(2) (2016) (repealed 2017). Being remedial, the rules of construction governing interpretation of the amended Ordinance do not provide us the latitude to ignore evidence of some reasons—including policy reasons—for the reduced fees.

The record reflects several potential "reasons other than an updated school impact fee study" for which the County reduced impact fees. Considering these other possible reasons contained in the record, broad construction of the County's self-imposed requirement for refunds "due to reasons other than an updated school impact fee study" shows that a genuine issue of material fact exists. *Id.* § 30-35(e). As such, I would reverse the trial court's grant of summary judgment and allow a jury to fulfill its proper role as the finder of fact.

## IV. Conclusion

25

*STADING, J., dissenting*

Under a *de novo* standard of review of summary judgment, when viewing the evidence presented by both parties—the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits—in the light most favorable to the nonmoving party, there are genuine issues of material fact. As to the fee payer class, there is evidence that TischlerBise's method of calculating impact fees, adopted by the County, did not use a planning period. Employment of a planning period is not evident in the consultant's method of calculation, nor is it known to the County's own 30(b)(6) witness. Since there is a genuine dispute of material fact as to whether the County used a planning period, the impact fees may have been *ultra vires*. For the refund class, the record contains evidence that impact fees were reduced for reasons other than an updated school impact fee study. The County's own 30(b)(6) witness cited concerns of "timing" and "the nature of the General Assembly." Thus, there is a genuine issue of material fact as to whether the County complied with the refund provision required by its Ordinance as amended in 2016. Accordingly, I respectfully dissent from the majority and would hold that the trial court's order granting summary judgment for Orange County must be reversed.